The defendant, a young Negro fourteen or fifteen years of age, was convicted under a bill of indictment charging him, in two counts, of rape *Page 663 
upon the person of Mrs. G. V. Parker and of burglary in breaking and entering the dwelling house then occupied by her, in the nighttime, with the intent to commit this felony.
Many of the details are unprintable, but the evidence necessary to an understanding of the decision upon the appeal may be summarized as follows:
The Parkers, husband and wife, and a daughter seven years old, lived as the sole occupants of a five room house in Wilmington. The house had a living room, two bedrooms, a dining room, kitchen and bath. The husband was away on the night of the occurrence, working at the shipyard, and Mrs. Parker and young child were alone in the house. She had been sewing, and a little after midnight cut off the radio and went to bed. She was eight months gone in pregnancy, was lying in bed in some discomfort and unable to sleep, and alert to noises. She heard a key turn in the lock of the front door, which she had locked before retiring. Thinking it was her husband who had returned because of sickness, or some other reason, she did not get up, but lay listening. She heard the sound of the French doors between the living room and dining room being opened, and called "Who is that?" and someone said, "It is me." Mrs. Parker said, "Who is me?" and got the reply, "Jake," and the person, whom she later identified as this defendant, pushed the bedroom door open, and with violence and threats to kill Mrs. Parker and her little girl who was in the room, overcame her resistance and accomplished the act as far as necessary to complete the crime. However, he became frightened at the cries of the little girl and left without fully completing the sexual act.
Mrs. Parker immediately called her neighbors from her window, called up her husband, who was working at the shipyard, and when he came, the police were called. Mrs. Parker detailed the circumstances to the policeman. Murray, minutely describing the defendant. Murray testified in corroboration of the witness, stating that she had described the clothing of her assailant, the physical appearance of his face and eyes and other characteristics, and said she was satisfied that she could recognize his eyes. She gave a detailed statement of what occurred that night; said that the boy was dressed in a pair of dark trousers, a dirty jacket, similar to a soldier's jacket, and had on a toboggan, giving other details corresponding with her testimony on the trial.
The occurrence was after midnight, and on that same morning Murray took Mrs. Parker through the colored section of the city to see whether the assailant could be found and identified. Finally, the defendant was seen walking along the sidewalk, and Mrs. Parker screamed, "There he is," becoming much agitated and hysterical. On account of Mrs. *Page 664 
Parker's condition, Murray did not want to bring Mrs. Parker nearer to the boy, but called other officers who followed and took him in charge, and he was carried to the office of Superintendent Fales for examination. He there confessed to the crime, going over in detail all the circumstances, and stating that he was frightened away by the crying of the little girl.
Upon trial of the case the voluntariness of this confession was challenged, and before admitting it in evidence, the jury was sent out and the question of its voluntariness was taken up by the court and evidence heard. On this inquiry the evidence was substantially as follows:
The witness Murray testified that prior to the confession neither he nor any person in his presence made any threat on or offered defendant any reward or leniency in the event he would make a statement, and that there was nothing done, of any nature, to force him to make it. That while Mr. Fales was beginning the questioning witness was outside, but was inside when the confession was made.
H. E. Fales, Superintendent of New Hanover County Bureau of Investigation, in whose office the confession was made, testified that "he did not offer the defendant any reward or hope of reward, or promise him any leniency for telling the truth about the matter; and that no one in his presence forced the defendant to make any statement." He further testified:
"I talked with the defendant about the crime. I told him he didn't have to say anything. I asked him how old he was, what school he went to, did he go to Sunday School, and if he had done the crime. He didn't know anything about it at first, and then I showed him the key. I searched him and found the key. I found the key in his watch pocket. It was a regular house key. After I found the key, I talked on a little bit and I said, `Did you unlock the door with this key?' and he said, `No, it was not locked,' and then he told me this story. He did admit he turned off the light, and I told him there were fingerprints, but I did not tell him they were his fingerprints. I told him this for the psychological effect. He did not come through with anything until I found the key. I asked him if he would go out with us and point out the alleged scene of the crime, and he said he would. He directed us to the proper street and up to this house, and when we got to the corner I said, `Where is the house?' and he said, `Right over there,' and he went to the house and I said, `Just what did you do?' and he showed us, and he went up to the front porch and said the door was not locked, and how he went through the French doors, and then he went in the bedroom and showed us where the woman and the girl were lying on the bed. Frankly, I don't remember whether the statement was signed before we went or after we came back." *Page 665 
The defendant testified substantially as follows:
"There were no officers at the exact time I came in there, but later Mr. Fales and Mr. Wolfe and Mr. Murray came in and two more policemen, and those other policemen were sitting there talking to me, and he told me he had my fingerprints and if I would come on and tell the truth it would be easier."
He testified that he had a key on him which Mr. Fales found and that Mr. Fales asked him about it; that he told Mr. Fales that his father kept tools and things on a shelf, and he got it from there. Mr. Fales suggested that he go down there and give a demonstration — said "did I want to go down there and show them the way to the house and everything"; that he was not told he didn't have to go; that after Mr. Fales told him he had his fingerprints, he thought he had to confess the crime.
"Q. Did he say anything about making it easier on you if you went through it?
"A. When I first came to the police station they said they had my fingerprints, and if I would tell the truth it would be a whole lot easier on me."
Upon the conclusion of this inquiry, the court found that the alleged confession was "given or obtained without any inducement of hope or fear, and that the same was the free and voluntary confession, admissible in evidence"; and the jury having been returned to the court room and the trial resumed, admitted the evidence of the confession over defendant's objection and exception.
The witness Murray, recalled, testified that the defendant said to him that he did go into the white lady's house and have sexual relations with her, but did not complete his desire because the little girl, who was there on the bed, started crying and he got afraid, picked up his trousers and went out. That defendant said he was around the Recreation Center at Tenth and Castle Streets and decided to go up into the white section and have sexual relations with a white woman. "I said, `You mean you had that in mind before you left?' and he said, `Yes.'" He then, according to this testimony, detailed the circumstances as they had been testified to by Mrs. Parker, who at that time had made no statement in his presence. That defendant voluntarily went with the officer and pointed out the house he had entered. That having done so, he asked the officer if he wished him to sit there on the wall and pull off his shoes as he did that night, and was told that it was not necessary. That he then went on in front of the officer, entered the house, pushed open the French doors and said, "This is the bedroom to the right." That he then pointed out the various things in the bedroom as they were on that night, showing where he had placed his hands upon the bed. That the defendant told *Page 666 
the officers he was wearing the same toboggan on the night of the occurrence that he wore when brought to the police office; and, asked if he had a brown jacket, he said he did and that it was at the laundry. That the policeman found the jacket there, and defendant stated that he had carried it to the cleaners next day. In this clothing they found a key.
N.J. Wolfe, a member of the police force, corroborated this statement.
The defendant's mother testified: "He is fifteen; he became fifteen on December 31, 1945."
After charging the jury, and after they had retired to the room to consider their verdict, the judge called them back and supplemented his charge as follows:
"Gentlemen of the Jury: At the conclusion of the charge I had a suspicion and a feeling that I had committed error with respect to the instruction relating to the second count, and I asked Mr. McEwen to read back to me that portion of the charge, which he did, which confirmed the impression which I had.
"I instructed you that under the second count you could render only one of two verdicts, to wit, guilty of burglary in the first degree, or not guilty, though later in the charge stating to you that by reason of the provision in the statute enacted by the Legislature of 1941, amending the law as it had theretofore existed, you were vested with an election notwithstanding the fact you found the facts constituted burglary in the first degree to render a verdict of guilty of burglary in the second degree.
"The defendant, by reason of the law as the Court has instructed you, had removed from him the right upon the evidence in this case, and the law applicable thereto, to insist upon a verdict of guilty of burglary in the second degree under the facts of the case, and I was afraid it had caused some confusion and misunderstanding in your minds, and for that reason I am calling you back to try to eliminate any confusion that may have been created, and to make it perfectly clear to you, and I now charge you, that under this second count of burglary you may render one of three verdicts, to wit, guilty of burglary in the first degree; guilty of burglary in the second degree, or, not guilty, and that you can render a verdict of guilty of burglary in the second degree in the exercise of your sound discretion and the election given you under the amendment even though you may be satisfied beyond a reasonable doubt from the evidence in this case, and may find facts from that evidence upon which, but for that proviso or amendment, you would find a verdict of guilty of burglary in the first degree."
The case was submitted to the jury and resulted in conviction of the defendant on both counts. Counsel for the defendant moved to set aside the verdict because of errors committed during the course of the trial, *Page 667 
which motion was refused, and the defendant excepted. Judgment imposing the death penalty was pronounced, to which the defendant objected, excepted, and appealed, assigning errors.
1. The admissibility of evidence, when challenged, is, imprimis, a question for the trial court. Where its admission preliminarily depends upon a determination of fact, the court of review is ordinarily bound by the finding of the trial judge when it is supported by evidence, and will not disturb that finding or ruling admitting the evidence unless there appears some error of law or legal inference.
Pertinent to confessions, it is observed in S. v. Grass, 223 N.C. 31,33, 25 S.E.2d 193:
"The competency of an alleged confession is a preliminary question for the trial court. S. v. Andrew, 61 N.C. 205, to be determined in the manner pointed out in S. v. Whitener, 191 N.C. 659, 132 S.E. 603, and the court's ruling thereon is not reviewable on appeal, unless accompanied by some imputed error of law or legal inference. S. v. Manning, 221 N.C. 70,18 S.E.2d 821." See, also, S. v. Hairston, 222 N.C. 455,23 S.E.2d 885; S. v. Rogers, 216 N.C. 731, 6 S.E.2d 499.
The trial judge was careful to preserve the rights of the youthful prisoner, and the record discloses no reason why the Court here should disturb his findings and conclusion, or his ruling admitting the evidence of the confession and the acts of the defendant upon visiting the scene of the alleged crime — if included in the objection and challenge of the defendant's counsel above noted. The ruling admitting the evidence must be sustained.
2. The defendant did not cause the whole charge to be sent up, nor indeed the specific language used in that portion of the charge to which he desires to direct our attention as erroneous. The exception might therefore, for sound reasons, be dismissed as ineffectual. We entertain it only because of the gravity of the crime of which defendant was convicted. But, supposing the supplemental instruction given by the judge by way of correction sufficiently reflects the charge as it theretofore stood, we cannot see how the defendant was prejudiced thereby. In fact, as the jury were called back especially for this correction, the rule last given, and correctly given, had all the more weight. S. v. Rogers, supra, p. 732; S.v. Baldwin, 178 N.C. 693, 100 S.E. 345. *Page 668 
We have not only given consideration to the two assignments of error brought forward in the argument and brief, but we have carefully examined the whole record and find nothing which would justify us in disturbing the result of the trial. We find
No error.