## STATE v. LEROY THOMAS.

(Filed 14 January, 1955.)

**1. Criminal Law § 33—**

A confession in a criminal action is voluntary in law if, and only if, it was in fact voluntarily made.

**2. Same—**

The competency of a confession is a preliminary question for the trial court, and the court's ruling thereon is not subject to review if supported by any competent evidence.

**3. Same—**

The mere fact that the defendant was in jail under arrest, and was there questioned by several officers does not render his confession incompetent.

**4. Same—**

It is not essential to the competency of a confession that the officers should have cautioned the defendant that any statement made by him might be used against him, and should have informed him that his refusal to answer could not thereafter be used to his prejudice.

**5. Same—**

The fact that officers, while questioning defendant, state that if defendant told them anything, to tell the truth, does not render defendant's confession incompetent.

**6. Same—**

Where the trial court duly hears testimony for the state and for the defendant upon the preliminary inquiry as to the voluntariness of the defendant's alleged confession, the trial court's finding that the confession was voluntary is conclusive on appeal when supported by competent evidence, and no error of law or legal inference is made to appear.

**7. Criminal Law § 52a (2)—**

An extrajudicial confession of guilt made by defendant must be corroborated by other evidence tending to establish the *corpus delicti* in order to be sufficient to sustain a conviction.

**8. Arson § 1—**

In order to prove the *corpus delicti* in a prosecution for arson, the state must show not only the burning of the house or other structure, but also that the burning was caused by criminal means.

**9. Arson § 7—**

The *corpus delicti* may be established by direct or by circumstantial evidence.

**10. Same—Defendant's confession and evidence aliunde establishing the corpus delicti held sufficient to be submitted to the jury.**

In addition to defendant's extrajudicial confession, the State's evidence tended to show that the defendant and his wife were separated, that the wife had gone to live with her sister and brother-in-law, that she had taken their bedclothing, over which the parties had disputed, and stored them in a closet of the house occupied by her brother-in-law, that there was animosity between the brother-in-law and defendant, that on the night of the fire all the lights were out of the house occupied by the brother-in-law, and the inmates thereof were apparently asleep, that defendant was seen leaving the house about midnight, and that about 5 or 10 minutes thereafter fire was seen coming from the closet, which spread to the house, burning it down. There was also evidence that shortly after the house burned defendant was asked why he had burned it, and that defendant did not deny the accusation. *Held:* The evidence *aliunde* the confession is sufficient to establish the *corpus delicti*, and the confession, corroborated by the other evidence, is sufficient to sustain conviction.

APPEAL by defendant from *Gwyn, J.,* July Term, 1954, of GUILFORD. No error.

Criminal prosecution upon a bill of indictment charging the defendant LeRoy Thomas with unlawfully, wilfully, feloniously and maliciously attempting to set fire to and burn a dwelling house, the property of Banks Marley, by setting fire to bedclothing in the said dwelling house with the intent and purpose to set fire thereby to the said dwelling house.

The defendant pleaded not guilty.

Verdict: Guilty as charged in the bill of indictment. Judgment: Imprisonment in the State's Prison.

Defendant excepted and appealed, assigning error.

*Harry McMullan, Attorney General; Ralph Moody, Asst. Attorney General; and Charles G. Powell, Jr., Member of Staff, for the State.*

*E. L. Alston, Jr., for Defendant, Appellant.*

PARKER, J. The defendant has two assignments of error, which pose two questions for decision. *One.* Was an alleged confession made by the defendant properly admitted in evidence? *Two.* Should his motion for judgment of nonsuit made at the conclusion of the State's evidence—the defendant introduced no evidence—have been allowed?

*First, the Voluntariness of the Defendant's Confession.*

Thurman Jones, a deputy sheriff of Guilford County, testified for the State that he arrested LeRoy Thomas, the defendant, on a warrant charging him with the capital crime of arson, and that he questioned him that same afternoon, while he was fingerprinting him, and immediately afterwards.

At this point in Thurman Jones' testimony counsel for the defendant requested the court "for a finding of fact as to whether or not any purported conversation was voluntary." Whereupon, the court sent the jury to their room, and the following testimony was elicited in their absence. Thurman Jones gave testimony tending to show: The defendant was not drunk, and had been in custody only a few minutes. He did not handcuff, or strike or otherwise mistreat the defendant. No one pointed a pistol or weapon at the defendant. He neither promised defendant any reward, nor gave him any inducement to make a statement, nor did anyone in his presence. Neither did he, nor anyone in his presence, make any threats against the defendant. The defendant had been in his presence all the time since he had been in custody. He did not tell the defendant if he confessed, it would go lighter on him, or if he didn't confess, he could convict him any way. He did not tell the defendant if he confessed he might get 10 years; if not, he might get life or the gas chamber. The only thing he told the defendant was: "Thomas, this is a serious charge. You know you couldn't do that, and get by with it without someone seeing you." To which the defendant replied: "I know it. When I left the house they turned the car lights on me as I went down the street." After the fingerprinting was finished, he went into a room and talked to the defendant in the presence of two officers. "We told him if he told us anything to tell the truth, if he would not tell the truth, not to tell anything at all." The defendant said he "wanted to tell the truth about it," and then made a statement. We did not tell him that what he said might be used against him, or that he did not have to talk.

LeRoy Thomas, the defendant, testified: That he was questioned by two officers, one of whom was Mr. Riley—Thurman Jones was not one of them—from 7:30 to 2:30 the Saturday he was arrested. On Sunday evening he was questioned by one man, who came from Raleigh; so he was told. One of the deputy sheriffs told him something like "It will be better for you if you confess, and it will be bad on you if you don't confess. We got you. We got three witnesses see you down there at the house at this time. We can prove you did it. You might as well make a confession." They did not tell me what would happen to me if I did not confess, but they were beating on the desk at me. They said: "Be better if you make a confession, and plead guilty to it, you would

come out better—might get out in 8 or 10 years, and then again you might not make no time."

Betty Warren testified for the State that she took down what the defendant said—not the questions. Three deputy sheriffs were questioning the defendant.

At this point the jury was recalled into the courtroom, and the court held that the statement made by the defendant was competent, and admitted it in evidence.

The defendant contends that he testified Mr. Riley and another officer questioned him, and that one of them told him it would be better for him if he confessed; that this evidence was not refuted, though Mr. Riley was in the courtroom and was pointed out by him; and therefore the statement was not voluntary.

The substance of Thurman Jones' testimony was to the effect that the defendant was not told, if he confessed, that it would be better for him, or that the officers used any such words to him as were testified to by the defendant.

A confession in a criminal action is voluntary in law if, and only if, it was in fact, voluntarily made. *S. v. Hamer,* 240 N.C. 85, 81 S.E. 2d 193. The Court said in *S. v. Marsh,* 234 N.C. 101, 66 S.E. 2d 684: "The competency of a confession is a preliminary question for the trial court, *S. v. Andrew,* 61 N.C. 205, to be determined in the manner pointed out in *S. v. Whitener,* 191 N.C. 659, 132 S.E. 603, and the Court's ruling thereon is not subject to review, if supported by any competent evidence. *S. v. Alston,* 215 N.C. 713, 3 S.E. 2d 11."

The mere fact that the defendant was in jail under arrest, and was there questioned by several officers does not render his confession incompetent. *S. v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572; *S. v. Stefanoff,* 206 N.C. 443, 174 S.E. 411.

It is not essential to the competency of the defendant's confession that the officers should have cautioned him that any statement made by him might be used against him, and should have informed him that he was at liberty to refuse to answer any questions, or to make any statement, and that such refusal could not thereafter be used to his prejudice. It suffices if the statement were voluntary. The questioning by the officers was not a judicial proceeding. *S. v. Lord,* 225 N.C. 354, 34 S.E. 2d 205; *Lyons v. Oklahoma,* 322 U.S. 596, 88 L. Ed. 1481. As to the rule in a judicial proceeding, see *S. v. Dixon,* 215 N.C. 438, 2 S.E. 2d 371; *S. v. Grier,* 203 N.C. 586, 166 S.E. 595.

The statement to the defendant by the officers that if he told them anything, to tell the truth, did not make the statement incompetent. "The rule generally approved is, that 'where the prisoner is advised to tell nothing but the truth, or even when what is said to him has no

tendency to induce him to make an untrue statement, his confession, in either case, is admissible.' " *S. v. Thompson,* 227 N.C. 19, 40 S.E. 2d 620.

The record discloses that the trial judge made due preliminary inquiry into the voluntariness of the confession allegedly made by the defendant. After hearing Thurman Jones and Betty Warren for the State, and the defendant for himself, the trial judge found that the confession was voluntary, and admitted it in evidence. This ruling cannot be disturbed on this appeal, because it is supported by competent evidence, and no error of law or legal inference appears. *S. v. Rogers, supra; S. v. Brooks,* 225 N.C. 662, 36 S.E. 2d 238.

*Second, the Sufficiency of the Evidence.*

The defendant contends that the State did not introduce any evidence *aliunde* the defendant's confession of sufficient probative value to withstand his motion for judgment of nonsuit under the rule set forth in *S. v. Cope,* 240 N.C. 244, 81 S.E. 2d 773.

The general rule is well settled that a naked extra-judicial confession of guilt by a defendant charged with crime, uncorroborated by any other evidence, is not sufficient to sustain a conviction. *S. v. Cope, supra;* Anno. 127 A.L.R. 1131, where the cases are assembled.

The overwhelming weight of authority requires that the evidence corroborating the confession must relate to and tend to establish the *corpus delicti.* Anno. 127 A.L.R. 1134, where the cases are cited.

*Whitfield, C. J.,* speaking for the Court in *Spears v. State,* 92 Miss. 613, 46 So. 166, 16 L.R.A. (N.S.) 285, said: "The *corpus delicti* in a case of arson consists, not only in the proof of the burning of the house or other thing burnt, but of criminal agency in causing the burning." A note in 16 L.R.A. (N.S.) 285, states: "However, in accordance with the rule laid down in *Spears v. State,* it is now universally recognized by all the courts that the *corpus delicti* in arson consists of both elements, that is not only the burning, but also the criminal agency causing it." And on p. 286 of the same note it is said: ". . . it naturally follows that there can be no conviction of arson without satisfactory proof, either by direct or circumstantial evidence, not only that the building was burned, but also that it was burned through some criminal agency, and was not an accidental or other providential cause." To the same effect see Anno. L.R.A. 1916 D 1299 *et seq.* Proof of *corpus delicti* in arson.

The *corpus delicti* may be established by direct or by circumstantial evidence. *S. v. Cope, supra;* 23 C.J.S., Criminal Law, p. 185.

In *Davis v. State* (Ala.), 37 So. 676, evidence that the prosecutor's house was burned in his absence, that no dynamite or other explosive substance was in his house when he left it, that there were tracks from the house to where a mule had been hitched, and mule tracks from there

to where defendant lived, that the mule tracks corresponded with the defendant's mule, and the finding of tufts of mule's hair that corresponded with the hair of defendant's mule, was held sufficient evidence of the *corpus delicti* to render admissible evidence of defendant's confession that he set fire to the house.

In *Com. v. McCann*, 97 Mass. 583, the Court said: "The fact that the barn had been burned was proved by other evidence. There was evidence of the hostility of the defendant towards the occupant of the property destroyed, and of her threats against him within a few hours before the fire. This was not, therefore, a case requiring the judge to instruct the jury whether uncorroborated confessions will warrant a conviction. *Commonwealth v. Tarr*, 4 Allen, 315."

The State's evidence tended to show these facts: The house in which Rufus Chapman and his wife and children lived was owned by Banks Marley. It was destroyed by fire on Saturday night, 3 April, 1954. Rufus Chapman is a brother of the defendant's wife, Rosa Belle. Their mother and their sister, Thelma Marcus, lived in a house on the same side of the street 15 or 20 feet from the Chapman house. Prior to the night of the fire the defendant and his wife had fallen out, and for a week or two before the fire she had been living with her mother. The Monday before the fire Rosa Belle had moved all the furniture and bedclothes belonging to defendant and her away from the house where they had lived, and stored the bedclothes, including sheets, quilts and blankets, in a closet on the back porch of the Chapman home. On Thursday night before the fire the defendant and his wife were on the Chapman back porch fussing over the bedclothes. She gave defendant two sheets and two blankets. The defendant was drinking. Chapman asked him to leave. He said he would, but he was coming back.

On Thursday before the fire defendant was at Thelma Marcus' home talking to his wife. He said "he was coming down there on Saturday to the house where his wife was between 4:00 and 6:00 o'clock, and when he left, it wouldn't be nobody left but him."

On Thursday night before the fire the defendant went to Jesse Corbett's house about 9:00 p.m. He was about half drunk. He said he had fallen out with his wife. Referring to Rufus Chapman and Rosa Belle he said: "I am going to get even with them people."

About a week before the fire Rufus Chapman had a warrant issued against the defendant for shooting at him. Chapman took up the warrant, and paid the costs.

On the night of the fire Thelma Marcus and George Curry went to the movies. They returned to her home, and about midnight were sitting in a car with the lights out in the space between the house in which she lived and the Chapman house. In 10 or 15 minutes they saw the

defendant come from behind the house and between the houses with a bedspread under his arm. When defendant came in front of the car, they cut the lights on him, and he started running. In about five minutes George Curry left, and Thelma Marcus went in her home. She was fixing her bed, and her mother hollered "Magnolia" (the defendant's wife) "your house is on fire." Thelma went outside. There were no lights on in the Chapman house. Fire was coming from the closet on the back porch. She called Magnolia. Everyone there seemed asleep. After Thelma broke the glass, Magnolia opened the door, and they took out six children who were asleep inside. It was a wooden house, and burned down fast.

When Rufus Chapman got home his house was falling in. He saw the defendant sitting on the back of a car in Jesse Corbett's yard. Jesse Corbett asked the defendant why he burned the house down. Defendant made no reply. Chapman asked him, "what you burn up the house for, what you set my children afire for?" The defendant replied he didn't burn it down. Chapman responded he did, and the defendant jumped on him.

George Curry saw the defendant in the earlier part of the evening of the fire, and he was drinking.

About a month before this closet caught fire from some hot ashes Chapman's wife had taken up.

Saturday night after the fire Jesse Corbett went to the defendant's house. He was in bed with all his clothes on but his shoes. He was not asleep. Corbett asked him "what he burned the house up for?" The defendant looked straight at him, and did not speak. He didn't deny it. The defendant "looked groggy; he was pretty drunk."

The defendant made the following statement in substance to the officers: That on Saturday night, 3 April, 1954, he went to the Chapman house. There were no lights in the house. He went to the closet on the back porch and got out a spread or quilt. When he started to leave, he decided if he couldn't have the rest of the stuff, his wife couldn't have it, so he struck a match, set a quilt on fire, and stayed until it was burning good. He left the burning quilt hanging in the closet. In leaving the car lights were turned on him. He went to his room, stayed a few minutes, and decided to go back to the house. In going back he met his mother-in-law, who cursed him, and accused him of burning up the house, which was then on fire. He then went back to his house. On Sunday he went on Market Street, and asked someone if they had a warrant for him, and that person said he didn't know. In respect to the fire, he said he thought the children would get out. He said he burned the house down out of meanness.

There is this evidence *aliunde* the defendant's confession: Immediately before the fire the lights were out in the Chapman house, and the inmates apparently asleep. The defendant and his wife had separated, fussed over their bedclothes, and most of these bedclothes were stored in a closet on the back porch of the Chapman house. About midnight the defendant was seen leaving the back of the houses occupied by Chapman and his wife and mother, with a bedspread under his arm. In 5 or 10 minutes fire was coming from this closet which spread to the house, burning it down. There was evidence of animosity on the part of defendant against Rufus Chapman and his wife. Shortly after the house burned up, Jesse Corbett asked defendant why he burned the house up, and the defendant never denied it.

In our opinion, and we so hold, there is evidence *aliunde* the defendant's confession that the house occupied by Rufus Chapman burned down, and that the defendant was the criminal agency causing the burning. Therefore, the extra-judicial confession of the defendant is corroborated by other evidence sufficient to sustain the conviction.

In the trial below we find

No error.