### STATE v. MARION FRANK CRAWFORD.

(Filed 27 November 1963.)

**1. Criminal Law § 71—**

Only a voluntary confession is competent in evidence, and a confession is voluntary when, and only when, it is in fact voluntarily made.

**2. Same—**

A confession otherwise voluntary is not rendered involuntary and therefore incompetent by the mere fact that the accused at the time of making the confession was under arrest or in jail or in the presence of armed officers.

**3. Same—**

Evidence upon the preliminary inquiry that defendant was advised of his rights and that defendant then, without being threatened or coerced, made the incriminating statements offered in evidence, and that defendant's counsel was given opportunity to cross-examine the witness in regard to the voluntariness of the confession made by defendant to the witness, *is held* to support the court's finding that the confession was in fact voluntary, and the admission of the confession in evidence will not be disturbed.

**4. Rape § 1—**

Rape is the carnal knowledge of a female, forcibly and against her will.

**5. Rape § 8—**

Carnal knowledge of any female child under the age of twelve years, regardless of consent, is rape. G.S. 14-21.

**6. Homicide § 4—**

A homicide committed in the prepetration of the capital offense of rape is murder in the first degree, irrespective of premeditation and deliberation. G.S. 14-17.

**7. Homicide § 11—**

An indictment for homicide in the language of the statute is sufficient, and proof that the murder was committed in the prepetration of a felony constitutes no variance. G.S. 52-144.

**8. Criminal Law § 101—**

An extrajudicial confession of a defendant is alone insufficient to sustain a conviction, but if the confession is corroborated by other evidence in regard to all of the elements of the crime, the evidence is sufficient to be submitted to the jury on the question of guilt.

**9. Homicide § 20— Evidence of defendant's guilt of murder in the first degree held sufficient to sustain conviction.**

The confession of defendant that while he was having sexual intercourse with an eight-year old child she started to scream and that he put his hand over her mouth, that when he took his hand off her mouth she spoke once, and said nothing more, that he believed her to be dead and carried away and hid her body, with corroborating evidence that deceased was last seen with defendant and that her body was found at the place where defendant said he placed it, with expert medical testimony of the use of force and violence in the penetration of deceased's vagina and that death resulted from suffocation from the bursting of air sacs in deceased's lungs, *is held* sufficient to be submitted to the jury and sustain a conviction of murder in the first degree.

**10. Homicide § 29; Criminal Law § 114— Charge on right of jury to recommend life imprisonment held without error.**

Where, in the preliminary portion of the charge, the court instructs the jury that it is the sole province of the jury to find the facts and return its verdict, and to exercise a discretion in regard to the punishment as the court would thereafter instruct the jury, and that the jury should arrive at the facts without sympathy or prejudice toward any person, and the court thereafter, in instructing the jury as to the possible verdicts, fully charges the jury that in the event the jury found defendant guilty of murder in the first degree the jury had the unbridled discretion to recommend that the punishment should be life imprisonment, the charge is without error, since, construed contextually, the cautionary instruction that the jury should arrive at their verdict without sympathy or prejudice toward any person could not have been misunderstood by the jury as affecting its unbridled discretion to recommend life imprisonment.

**11. Homicide § 28—**

When all of the evidence tends to show that defendant killed deceased in the prepetration of rape, without evidence of guilt of a less degree of the crime, the court correctly refrains from submitting the question of defendant's guilt of murder in the second degree.

APPEAL by defendant from *Johnston, J.,* 4 February 1963 Session of FORSYTH.

Criminal prosecution on indictment charging the defendant with murder in the first degree.

Plea: Not guilty. Verdict: Guilty of murder in the first degree as charged in the bill of indictment.

From a judgment of death by asphyxiation, defendant appeals.

*Attorney General T. W. Bruton and Assistant Attorney General James F. Bullock for the State.*

*Hosea V. Price for defendant appellant.*

PARKER, J. The record discloses that the State introduced evidence as follows: On Sunday, 18 November 1962 Sandra Denise Marshall, a Negro girl born 14 August 1954, was living with her mother Vera Sanders in a house at 1203 Free Street in the Happy Hill Garden section of the city of Winston-Salem. Defendant Marion Frank Crawford, a Negro man born on 10 June 1936, lived in a house on Willow Street, which is back of the house where Vera Sanders and her daughter lived. Vera Sanders knew the defendant by the name of Willie. Sandra and other children in the neighborhood called him Uncle Willie.

About 4:00 p.m. on Sunday, 18 November 1962 the defendant came to Vera Sanders' home. He stayed about 15 minutes, and then he and Sandra went out the house about the same time. That was the last time Vera saw Sandra alive.

Eloise Finney lives at 1207 Free Street. About 4:00 or 4:15 p.m. on 18 November 1962 defendant came to her house with Sandra Denise Marshall. Eloise said to him: "Now that your wife has gone home already, you're just like a little chicken on a wire." "I says, you're just running around everywhere." He said: "Yes, that when his wife was there he gave her all the loving and affection she needed, but when she was away he did what he wanted to." Sandra did not say anything, "She just looked up like she was hypnotized." They stayed three or four minutes. Then, as Eloise testified, "he just took her by the hand, and they both went out my back door."

When Sandra did not return home, her mother went out looking for her. Periodically she returned to see if Sandra had come back. About 11:00 p.m. that night Eloise Finney came to her house to use a buffer. She and Eloise went to where the defendant was living, arriving there about 11:15 p.m. The defendant came to the door. Vera asked him about Sandra. He replied, "he left all the children out on the street playing." Vera then went to Elizabeth Griffin's house, and called her mother's home. She then went back to where the defendant lived. Then she and the defendant went to a number of places, and finally to the police station to report that Sandra was missing.

About 10:30 a.m. on 26 November 1962 Sergeant G. C. Wilson of the Winston-Salem Police Department and four policemen and the Rescue Squad went to a graveyard in the Happy Hill Garden section. This cemetery is not kept up. It is grown over with briers, honeysuckle vines, weeds, and trees, and in some places it is impossible to get through. They searched this graveyard for about three hours looking for Sandra, but without success. They left and went to other places looking for her, and again without success. Then they returned to the cemetery in the Happy Hill Garden section, and that afternoon found Sandra's dead body in a hole under a tree that had blown over and pulled up some dirt as it was blown over. The dead body and the hole were covered with leaves and honeysuckle vines and a small toy wagon. When Sergeant Wilson raised the little toy wagon and saw the child's coat, he placed the wagon back and called the county coroner Dr. W. D. Vreeland. He did not move or touch the body.

Dr. Vreeland is a graduate of an accredited medical school and is licensed to practice medicine in North Carolina. The court found he is an expert physician and surgeon. When he arrived at the scene and was standing within two feet of the body, he could not see it, because it was covered with vines and leaves. Sergeant Wilson pointed the place out to him. He cleared away the vines and leaves and the little toy wagon that was on the top of the body. When he first saw the body, it was lying on its left side with the head sharply doubled down, up under the left shoulder, the arms were wrapped around the head, and the legs were pulled up sharply against the chest. Her dead body was fully clothed except for her panties, which were under the body. Dr. Vreeland used gloves in a superficial examination of the body there, because she appeared to have been dead some time. The body was carried to the Kate Bitting Hospital morgue, where Dr. Vreeland examined the body in more detail. In the hospital he found her vagina gaping open widely, and it definitely appeared to be injured. Dr. Vreeland's opinion was that Sandra died from suffocation and shock due to trauma. Being of opinion that it would be preferable to have Sandra's body examined by a pathologist, Dr. Vreeland sent her body to Dr. Geoffrey Mann of Richmond, Virginia, for an autopsy.

At 8:20 p.m. on 26 November 1962, Sergeant C. E. Cherry of the Winston-Salem Police Department picked up the dead body of Sandra Denise Marshall at the Kate Bitting Hospital morgue and delivered it to the morgue of the University of Virginia, Medical Center, Richmond, Virginia, at 2:20 a.m. on 27 November 1962. About 9:00 a.m. on 27 November 1962, Dr. Geoffrey Mann started an autopsy on

Sandra's dead body. Sergeant Cherry was present during most of Dr. Mann's autopsy on Sandra's dead body.

Dr. Geoffrey Mann is a graduate of an accredited medical school, the University of Manitoba, Manitoba, Canada. He holds the following degrees: AA, BS, LLB and MD. He is licensed to practice medicine in Virginia and Mississippi. He is a Fellow of the Royal Society of Tropical Medicine and Hygiene, a Fellow of the American College of Pathologists, a Fellow of the American College of Clinical Pathologists, a Fellow of the American Academy of Forensic Sciences. He is the author of a number of textbooks in the field of forensic pathology and traumatic pathology. He is a contributor to about a hundred papers on the subject. He is Chief Medical Examiner of Virginia; Professor and Chairman of the Department of Legal Medicine of the Medical College of Virginia; and Professor of Forensic Medicine at the University of Virginia. He is senior consultant to the Armed Forces Institute of Pathology, and senior consultant of the Federal Air Aviation Agency. He has been engaged in the practice of forensic pathology and conductor of post-mortem examinations due to traumatic deaths for about twenty years. He has performed ten to fifteen thousand autopsies. The court held that Dr. Mann is an expert as a physician and surgeon, specializing in the field of pathology.

Dr. Mann testified in substance: Beginning at 9:30 a.m. on 27 November 1962 he performed a post-mortem examination on the body of Sandra Denise Marshall, which body was identified to him by Sergeant C. E. Cherry, a police officer who accompanied the body. He examined Sandra's body from head to toe, inside and out. He first made an external examination of the body. The child had a considerable number of abrasions about the face and forehead and over various other portions of the legs and arms, where the skin had rubbed off. She had numerous scratches about the body, many of which he thought were post-mortem; that is, that they occurred after death, and probably caused from dragging the body, or the body being forced against some object, such as the ground or some extraneous, foreign material. His autopsy disclosed that the child's vaginal orifice had been widely dilated. Her hymen had been violently torn and completely ruptured as a result of some entry into her vagina. He could pick up the hymen by using forceps and reconstruct it. There was a tremendous amount of bruising inside her vagina. The membrane separating the private parts of the child from the lower portion of the pelvis was completely suffused with blood, causing it to be markedly swollen and filled with fluid and blood. It takes tremendous injury to produce this type of membrane in this particular region. In his opinion, based on his autopsy,

STATE *v.* CRAWFORD.

there had been a forceful entry into the child's vagina by some foreign object, applied with considerable force. His autopsy of Sandra's body showed that many of the little air sacs which make up the lungs had been exploded. This is almost one hundred per cent indicative that severe pressure had been applied to her mouth and nose. He found marks on her neck, which he interpreted as fingernail marks, and a small bit of hemorrhage in a muscle of her neck. In his opinion, Sandra came to her death as a result of suffocation by pressure being applied to the mouth and nose: "that pressure applied to the mouth and nose played the biggest factor in the death of the child." From his examination he thought she had been dead anywhere from three to ten days, with the probability leaning to ten days rather than three.

About 11:30 p.m. on 29 November 1962, three police officers of Winston-Salem arrested the defendant in the town of Jonesville at the home of Tildon Foster. At that time the defendant was known to them as Willie Gilchrist. They carried him to the city hall in Winston-Salem and talked to him 15 or 20 minutes in the office of Detective Captain Burke. The defendant said his name was Willie Gilchrist, and gave the officers the names of his father and mother in Spartanburg, South Carolina. The officers showed him a photograph of Willie Gilchrist in Spartanburg. The defendant said he was his half brother, and that he had the same name. They then placed him in the county jail.

The next morning between 10:00 and 11:00 a.m. the defendant was carried to the office of Captain Burke. Lieutenant Henry C. Carter of the Winston-Salem Police Department and Detectives Landon and Smith were present. The defendant made a statement, which was taken down in longhand by Detective Landon and later transcribed by typewriter. Defendant was afterwards given a transcribed copy of his statement, and it was read to him. The defendant said it was correct and signed it. The statement defendant made to the officers is, in substance, as follows: His name is Marion Frank Crawford. He is 26 years old. He was born in Spartanburg, South Carolina, on 10 June 1936. He was serving 20 years in prison in South Carolina for cutting Max Swain and fracturing his skull. He escaped on 27 or 29 July and came to Winston-Salem. He told Sandra Denise Marshall that he was going to a store to get some ice cream. He started walking toward the store, and she followed him. When he reached the store, he went inside and purchased a pack of cigarettes for himself and a bar of candy for her. She waited on the outside of the store. When he came out of the store, they walked up the street and then into an open field. He told her to lie down. He took her pants off. He got on top of her and had sexual intercourse with her. She started to scuffle, and everything went blank.

She started to scream and he put his hand over her mouth. When he took his hand off of her mouth, she said "Uncle Willie" and did not say anything else. He said to himself, "Lord, what have I done?" He believed she was dead. He left, went around part of the field, came back by Free Street, went up on the corner, and talked with some people. He then left the corner, went back and picked Sandra up and carried her back up the branch toward Free Street and around the back of 808 Willow Street and on up to a fence. He placed her body on the wires near a post. He hung her jacket on the fence. He jumped over the fence, pulled her over the fence, and placed her in the graveyard near an old tree. He then left. The next day he went back to the graveyard and moved her body, placing it near an old tree lying on the ground. He laid her panties on her and then placed an old wagon over her with the sides down. She scuffled because "she wasn't used to it, and it caused her to scuffle." The State introduced in evidence the written statement signed by defendant, which is practically identical with the oral statement which Lieutenant Carter testified defendant made. Later the defendant carried the officers to the place where he finally left Sandra's dead body.

The defendant offered no evidence.

Defendant assigns as error the admission in evidence of his confession, and the admission in evidence of the written copy of his confession signed by him.

It is hornbook law that a voluntary confession is admissible in evidence against the one making it; an involuntary confession is not. A confession is voluntary in law when, and only when, it was in fact voluntarily made. *S. v. Davis,* 253 N.C. 86, 116 S.E. 2d 365; *S. v. Livingston,* 202 N.C. 809, 164 S.E. 337. A confession otherwise voluntary is not rendered involuntary and therefore incompetent by the mere fact that the accused at the time of making the confession was under arrest or in jail or in the presence of armed officers. *S. v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572, 28 A. L. R. 2d 1104; *S. v. Litteral,* 227 N.C. 527, 43 S.E. 2d 84; *S. v. Bennett,* 226 N.C. 82, 36 S.E. 2d 708; *S. v. Thompson,* 224 N.C. 661, 32 S.E. 2d 24; *S. v. Wagstaff,* 219 N.C. 15, 12 S.E. 2d 657; *S. v. Stefanoff,* 206 N.C. 443, 174 S.E. 411; *S. v. Gray,* 192 N.C. 594, 135 S.E. 535; *Culombe v. Connecticut,* 367 U.S. 568, 6 L. Ed. 2d 1037, 1050-1053, and note 38 on p. 1051. When Lieutenant Carter testified defendant made a statement, defendant challenged its admissibility in evidence. Whereupon, the trial judge had a preliminary inquiry and afforded both the State and the defendant a reasonable opportunity to present evidence in the absence of the jury showing the circumstances under which the confession was made. *S. v. Rogers,*

*supra;* *S. v. Gibson,* 216 N.C. 535, 5 S.E. 2d 717; *S. v. Whitener,* 191 N.C. 659, 132 S.E. 603.

Defendant's counsel cross-examined Lieutenant Carter at length. The record discloses that Lieutenant Carter told defendant, before he made any statement, that he did not have to make any statement whatever, unless he wanted to, and that if he did make any statement, it could be used against him or for him in court, and that he was entitled to an attorney, and could use the telephone if he wanted to. Defendant made no request. After defendant's counsel had finished his cross-examination of Lieutenant Carter, the trial judge asked him: "Is there anything more that you want to offer to (sic) this preliminary examination? Are there any more questions that you want to ask him?" Defendant's counsel replied, "No, your Honor." Defendant offered no evidence on the preliminary inquiry.

The record tends to show that defendant's confession was the product of an essentially free and unconstrained choice by him, and entirely voluntary. There is nothing in the record to show the contrary. Defendant in his brief has no statement or argument that his confession was not voluntary. The trial judge found, upon a consideration of all the evidence offered on the preliminary inquiry, that defendant's confession was voluntarily made and then admitted it in evidence. The competency of the confession was a matter for the trial judge. He ruled it admissible, and this ruling is supported by competent evidence. *S. v. Rogers, supra;* *S. v. Hairston,* 222 N.C. 455, 23 S.E. 2d 885; *S. v. Manning,* 221 N.C. 70, 18 S.E. 2d 821; *S. v. Alston,* 215 N.C. 713, 3 S.E. 2d 11. No error in this respect has been made to appear in the record. In addition, no error has been made to appear in the record in the admission in evidence of defendant's written confession signed by him.

Defendant has other assignments of error to the admission of evidence. However, in his brief he has neither reason nor argument stated or authority cited in support of these assignments of error. They present no new question, merit no discussion, and after having been carefully examined are all overruled.

Defendant assigns as error the denial of his motion for judgment of nonsuit.

"Rape is the carnal knowledge of a female, *forcibly* and *against her will.*" *S. v. Jim,* 12 N.C. 142. This was the early definition of the crime, and it is still a correct definition of the crime. *S. v. Johnston,* 76 N.C. 209; *S. v. Marsh,* 132 N.C. 1000, 43 S.E. 828; *S. v. Johnson,* 226 N.C. 671, 40 S.E. 2d 113. Our statute, G.S. 14-21, also makes it rape carnally to know and abuse any female child under the age of twelve years, even though she consents. *S. v. Storkey,* 63 N.C. 7; *S. v. Johnston,*

*supra; S. v. Johnson, supra; S. v. Jones,* 249 N.C. 134, 105 S.E. 2d 513; *S. v. Strickland,* 254 N.C. 658, 119 S.E. 2d 781.

G.S. 14-17 provides: "A murder \* \* \* which shall be committed in the perpetration or attempt to perpetrate any \* \* \* rape, \* \* \*, shall be deemed to be murder in the first degree and shall be punished with death: Provided, if at the time of rendering its verdict in open court, the jury shall so recommend, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury." *S. v. Grayson,* 239 N.C. 453, 80 S.E. 2d 387; *S. v. King,* 226 N.C. 241, 37 S.E. 2d 684; *S. v. Mays,* 225 N.C. 486, 35 S.E. 2d 494.

This Court said in *S. v. Mays, supra*: "When a homicide is committed in the perpetration of the capital felony of rape the State is not put to proof of premeditation and deliberation. Proof that the homicide was committed in the perpetration or attempted perpetration of the felony of rape is all that is required. *S. v. Dunheen,* 224 N.C. 738."

The indictment here charges the capital felony of murder in the language prescribed by statute. G.S. 15-144. In *S. v. Mays, supra,* the Court said: "The bill of indictment charges the capital felony of murder in the language prescribed by statute. G.S. 15-144. It contains every averment necessary to be made. *S. v. Arnold,* 107 N.C. 861; *S. v. R. R.,* 125 N.C. 666. Proof that the murder was committed in the perpetration of a felony constitutes no variance between *allegata* and *probata. S. v. Fogleman,* 204 N.C. 401, 168 S.E. 536. If the defendant desired more definite information he had the right to request a bill of particulars, in the absence of which he has no cause to complain." See also *S. v. Maynard,* 247 N.C. 462, 101 S.E. 2d 340; *S. v. Scales,* 242 N.C. 400, 87 S.E. 2d 916; *S. v. Streeton,* 231 N.C. 301, 56 S.E. 2d 649.

The general rule is well settled in North Carolina, and it seems also in this nation, that a naked extrajudicial confession of guilt by one accused of crime, uncorroborated by any other evidence, is not sufficient to warrant or sustain a conviction. *S. v. Long,* 2 N.C. 455; *S. v. Cope,* 240 N.C. 244, 81 S.E. 2d 773; *S. v. Thomas.* 241 N.C. 337, 85 S.E. 2d 300; Anno. 127 A. L. R. 1131, where the cases are assembled.

The State has offered this evidence, *aliunde* of defendant's confession, of the *corpus delicti*: About 4:00 p.m. on Sunday, 18 November 1962, defendant came to the home of Vera Sanders, mother of Sandra Denise Marshall. Sandra was born 14 August 1954. He stayed about 15 minutes, and then he and Sandra went out the house about the same time. That was the last time Vera Sanders saw Sandra alive. About 4:00 or 4:15 p.m. on the same afternoon, defendant and Sandra went to the home of Eloise Finney. They stayed three or four minutes, and, as Eloise testified, "he just took her by the hand, and they both

went out my back door." On the afternoon of 26 November 1962, police officers of the city of Winston-Salem found Sandra's dead body in a graveyard in the Happy Hill Garden section. This graveyard was grown over with briers, honeysuckle vines, weeds, and trees. Her dead body was in a hole under a tree that had blown over and pulled up some dirt as it was blown over. The dead body and the hole were covered with leaves and honeysuckle vines and a small toy wagon. Her body was fully clothed, except for her panties which were under the body. Defendant in his confession stated he took Sandra's pants off before he had sexual intercourse with her, that he laid her pants on her dead body, and placed an old wagon over her dead body with the sides down. Defendant afterwards carried police officers to the place where they found Sandra's dead body. Dr. Geoffrey Mann, an exceptionally well-qualified pathologist, performed a port-mortem examination on Sandra's body, examining her body from head to toe, inside and out. His testimony is to the effect that there had been a forcible entry into Sandra's vagina by some foreign object, applied with considerable force, that many of the little air sacs which make up the lungs had been exploded, and he expressed the opinion that she came to her death as a result of suffocation by pressure being applied to her mouth and nose. Defendant in his confession said when Sandra started to scream he put his hand over her mouth, and when he took his hand off of her mouth, she said "Uncle Willie," and did not say anything else. The testimony of Dr. W. D. Vreeland, a licensed medical doctor in North Carolina and county coroner, is that he examined Sandra's dead body in the Kate Bitting Hospital morgue in Winston-Salem and found her vagina gaping open widely, and that it definitely appeared to be injured, and that in his opinion Sandra died from suffocation and shock due to trauma. In our opinion, and we so hold, the State has offered in evidence sufficient extrinsic corroborative circumstances, as will, when taken in connection with defendant's confession, suffice to show that defendant murdered Sandra Denise Marshall in the perpetration of rape, and to sustain the conviction. The trial court properly submitted the case to the jury.

The trial court began its charge to the jury by reading the indictment, by instructing the jury as to the legal effect of a plea of not guilty, and by giving a correct definition of the term "a reasonable doubt." He then instructed the jury:

"It is the province of the jury, and the sole province of the jury, to determine what the facts are in the case and, as the Court will hereafter instruct you, to exercise a discretion in the question of punishment. You determine what the facts are from all of the evi-

dence that is offered in the case, determining what the truth is and, then, you take the law as it is announced by the Court and apply it to the facts as you find them, and thereby arrive at your verdict, (A) allowing your verdict, insofar as it is humanly possible, to speak the truth, which is the very meaning of the word, 'verdict,' itself, and do this, Members of the Jury, without sympathy or without prejudice towards any person. (B)"

Defendant assigns as error the above part of the charge between the letters (A) and (B).

The trial court then instructed the jury that they could return one of three verdicts: Guilty of murder in the first degree as charged in the indictment, and that if they returned this verdict, the defendant's punishment will be death; or guilty of murder in the first degree with a recommendation that the defendant be punished by life imprisonment, and that if they returned this verdict, defendant's punishment will be life imprisonment; or not guilty. The court then read to the jury G.S. 14-17, with the proviso: "If at the time of rendering its verdict in open court, the jury shall so recommend, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury."

A little further on in its charge the court instructed the jury:

"Now, gentlemen, the Court instructs you that under that statute, Chapter 14, Section 17, and under the law of this State, if you find the prisoner guilty of murder in the first degree - - - and you will understand that the Court is not suggesting that you so find - - - you may, at the time of returning your verdict into open court, recommend that the prisoner's punishment shall be life imprisonment, and, in which case, your verdict would be guilty of murder in the first degree with the recommendation that the prisoner's punishment shall be life imprisonment. And the Court instructs you that in such an event, the prisoner's punishment shall be automatically fixed at life imprisonment. This right that you have is an unbridled right; it is absolute in you, and it is without any restrictions, conditions, or limitations whatever."

In closing its charge, the court instructed the jury:

"If you return a verdict of murder in the first degree, the Court instructs you now, as it has already instructed you, that you may at the time of returning your verdict into open Court, recommend that the prisoner's punishment be imprisonment for life, and in that event, the punishment will be imprisonment for life. You are

instructed that this is a right that you have that is unbridled and that is without conditions, restrictions, or limitations. You may return one of three verdicts in the case.

"1. Guilty of murder in the first degree as charged in the bill of indictment.

"2. Guilty of murder in the first degree with a recommendation that the punishment of the prisoner be life imprisonment.

"3. Not guilty.

depending upon how you, the jury, find the facts under the evidence and the Court's instructions as to the law."

The trial court correctly instructed the jury, as required by the proviso contained in G.S. 14-17. *S. v. McMillan*, 233 N.C. 630, 65 S.E. 2d 212; *S. v. Carter*, 243 N.C. 106, 89 S.E. 2d 789; *S. v. Denny*, 249 N.C. 113, 105 S.E. 2d 446.

Defendant contends that the challenged part of the charge, to the effect that the jury should arrive at its verdict so as to speak the truth, and to do this without sympathy or prejudice to anyone, was in effect an instruction to the jury that they should not show any sympathy to him, and deprived him of the right vested in the jury by the proviso contained in G.S. 14-17 to exercise an absolute and "unbridled discretionary right" to recommend for him life imprisonment, if they convicted him of murder in the first degree. With this contention we do not agree.

The admonition or cautionary instruction that the jury should arrive at their verdict "without sympathy or without prejudice towards any person" was given in what may be termed the prologue to the charge, and in this prologue to the charge the court instructed the jury: "It is the province of the jury, and the sole province of the jury, to determine what the facts are in the case and, as the court will hereafter instruct you, to exercise a discretion in the question of punishment." A study of this introductory cautionary instruction leads us to the opinion that the part of the charge complained of could hardly have been understood otherwise by the jury than as having reference to the duty of the jury in arriving at their verdict on the primary question before them, namely, whether the defendant was guilty or not guilty of the crime charged in the indictment. The court, after the challenged part of the charge, instructed the jury that they could return one of three verdicts; that if they returned a verdict of guilty of murder in the first degree with a recommendation that the defendant be punished with life imprisonment, his punishment will be life imprisonment, and read to them G.S. 14-17. A little later in the charge

the court instructed the jury that its right to recommend life imprisonment, if they convicted the defendant of first degree murder, "is an unbridled right; it is absolute in you, and it is without any restrictions, conditions, or limitations whatever," and in the conclusion of the charge the court gave substantially the same instruction. A reading of the charge as a whole (*S. v. Burgess,* 245 N.C. 304, 96 S.E. 2d 54) leads us to the conclusion that the charge could leave the jury in no doubt that relief from the death penalty, if they convicted defendant of first degree murder, was committed without limitation of any kind to their discretion, and that there is no reasonable ground to believe the jury was misled or misinformed.

A jury should not convict or acquit a defendant by reason of sympathy or prejudice. If there was sympathy here, it would seem that it was for Sandra Denise Marshall and her tragic death, and if there was prejudice here, it would seem it would be against the defendant, and cautioning the jury against sympathy and prejudice under the facts here in arriving at a verdict of guilty or not guilty was not harmful to defendant. It would seem that it is the duty of a court to caution the jury against sympathy and prejudice in arriving at a verdict of guilty or not guilty whenever the circumstances require it. *People v. Botkin,* 9 Cal. App. 244, 98 P. 861; *Doyle v. State,* 39 Fla. 155, 22 So. 272; *Kirchman v. State,* 122 Neb. 624, 241 N.W. 100; *State v. Trapp,* 56 Ore. 588, 109 P. 1094; *S. v. Barton,* 70 Ore. 470, 142 P. 348; *Commonwealth v. Cisneros,* 381 Pa. 447, 113 A. 2d 293; *State v. Malloy,* 79 S.C. 76, 60 S.E. 228; *S. v. Harsted,* 66 Wash. 158, 119 P. 24; 53 Am. Jur., Trial, sec. 822; 88 C. J. S., Trial, sec. 297, b, Cautionary Instructions, p. 809. See *S. v. Fulkerson,* 61 N.C. 233; *S. v. McCarter,* 98 N.C. 637, 4 S.E. 553. In *Daniel v. United States,* 268 F. 2d 849, the Court said: "Admonitions against prejudice and sympathy are part of the boiler plate of a criminal charge." The assignment of error to the charge is overruled. There is no other assignment of error to the charge.

The record shows no evidence of murder in the second degree or of manslaughter. The trial court properly limited the possible verdicts to those set out in the record. *S. v. Mays, supra.*

Lieutenant Henry C. Canter testified that Sandra was "a little girl." The pathos of this little eight-year-old girl's last words, "Uncle Willie," after she had been brutally ravished and was dying from suffocation by reason of the explosion of many little air sacs, which made up her lungs, caused by pressure applied to her mouth and nose by the 26-year-old defendant, haunts the mind. The facts here recall to memory the words of the apostle James, which have come ringing down the

centuries: "When lust hath conceived, it bringeth forth sin: and sin, when it is finished, bringeth forth death." The Epistle of James, Ch. 1, v. 15—King James Version.

All defendant's assignments of error are overruled. In the trial below we find

No error.