STATE OF NORTH CAROLINA v. JOHN LEE EDWARDS

No. 2

(Filed 15 November 1972)

**Criminal Law §§ 75, 76— confession — finding of voluntariness unsupported by evidence — admission as prejudicial error**

Evidence presented on *voir dire* was insufficient to support the judge's finding that defendant's confession was voluntarily made where such evidence tended to show that defendant, an 18-year-old retarded male, was interrogated long into the night, that defendant finally confessed to the commission of the alleged offenses, that officers reduced the confession to writing and obtained a promise from defendant that he would repeat the confession and sign it in the presence of a court appointed attorney, and that defendant did in fact adhere to his promise despite advice from his attorney not to sign the confession or to make any admission; therefore, the court committed prejudicial error in a first degree murder and first degree burglary case by allowing the State to offer defendant's confession into evidence.

APPEAL by defendant from *McKinnon, J.,* January 10, 1972 Session, ORANGE Superior Court.

The defendant, John Lee Edwards, was charged by grand jury indictments with the capital felonies of first degree burglary and first degree murder. The offenses are alleged to have been committed on the night of September 4-5, 1971. The charges involved the forcible entry into the home of Mrs. Dora Lloyd for the purpose of committing the felony of rape and the first degree murder of Mrs. Lloyd.

On the morning of September 5, 1971, the dead body of Mrs. Lloyd was discovered in the house where she lived alone in Orange County. The autopsy disclosed she had died as a result of strangulation, perhaps by human hands. At the time of her death Mrs. Lloyd was 83 years of age.

On September 23 or 24 the officers questioned the defendant, a colored male eighteen years of age, concerning his possible connection with the charges of burglary and murder. At the time of the interrogation he was a suspect, but not under arrest. After being advised of his constitutional rights, he said he had nothing whatever to do with the murder of Mrs. Lloyd or the entry into her home. He gave an account of his actions on the night of September 4-5 and named the persons who were with him.

During a further interrogation on September 24, the defendant's bondsman on another charge surrendered him to the interrogating officers who told him their information indicated he was not telling the truth. After questioning for several hours, he finally broke down, cried, and confessed that he forcibly entered the home of Mrs. Lloyd for the purpose of committing larceny. When she discovered his presence and screamed, he choked her until she ceased to resist. These admissions were obtained after midnight. The officers reduced the admissions to writing, using as nearly as possible the defendant's words. The officers requested and obtained a promise that he would repeat the admissions in the presence of an attorney when one was appointed for him.

Immediately after obtaining the confession and the promise to repeat it, the officers called the district judge and requested the appointment of counsel. Although the hour was after midnight, the judge immediately appointed Attorney F. Lloyd Noell who met the officers and the prisoner soon after they arrived at the jail in Hillsborough. Following a short interview with the defendant, Mr. Noell advised him not to make any statements and not to sign any papers.

Officer Horton on cross-examination made this admission: "I think the biggest part of the conversation between Chapel Hill and Hillsborough was the fact that John would make this statement in the presence of his attorney. . . . He was asked if he would make the statement in the presence of an attorney. . . . He was asked if you will give us the same statement in the presence of your attorney, the answer was, yes."

While the officers, the defendant, and Mr. Noell were together, the officers advised the defendant that he was not bound to accept the advice of his attorney, but that he had the right to decide for himself whether to sign the confession. At this time they presented the memorandum which had been written in Chapel Hill a short time before. The officers stated they would like for him to sign it and pointed out on the paper a place for his name. Declining the advice of his attorney, accepting the advice of the officers, he signed the confession. The hour was about 3 o'clock in the morning following a night of interrogation.

Shortly after the signing of the memorandum, defendant's counsel petitioned the court to order a psychological examina-

State v. Edwards

tion of the defendant. Pursuant to the petition, the court ordered the defendant committed to Cherry Hospital for observation. The following is the conclusion of the hospital staff:

". . . Psychological report reveals a mild degree of retardation at the level of IQ 60. He was tense, hostile and suspicious during the psychological testing. He admitted that just before going to sleep he hears a voice talking to him saying, 'Why come I don't get to my normal self' and also that he sees something like 'humans fighting.' The patient did actually reaffirm the presence of these hallucinatory experiences in the interview of 11-23-71.

"In evaluating this case, it is the feeling of the staff that the accident referred to in the past history that occurred early in 1968 when his bicycle was struck by a car, is not likely to be a contributory factor to the abnormalities seen on the electroencephalogram (brain wave test). The abnormality described as 14 & 6 positive spike phenomenon is seen in adolescents who show abnormal particularly aggressive behavior but it is not quite conclusive for any behavior abnormality. There is definite evidence of mental retardation and environmental problems have led to sullen and resentful attitude in this individual. The brief hallucinatory experiences described are not sufficiently severe to cause this disturbed behavior and to justify the diagnosis of psychotic disorder. The only positively established diagnoses are Mental Retardation, Mild, IQ 60 and Adjustment Reaction of Adolescence, and Without Psychosis. In the opinion of the staff, John Lee Edwards is competent to stand trial."

The trial began on January 10, 1972. Without objection, the indictments were consolidated and the cases tried together. After the jury was selected the State offered evidence tending to show that Mrs. Lloyd's home had been forcibly entered and she had been killed by strangulation.

When the State offered the written confession by the defendant, his counsel objected. During the voir dire, one of the officers who conducted the interrogation testified, describing the prisoner: "I would say that he hasn't had the opportunity that those of us . . . fortunate enough to have parents. To the best of my knowledge, he more or less grew up making his own rules and fighting for his survival."

The judge, in the absence of the jury, heard the evidence heretofore recited with respect to the circumstances under which the confession was obtained and concluded it was voluntarily made by the defendant in the presence of counsel. The confession was admitted in evidence over defendant's objection. The defendant's motions to dismiss both charges were denied.

The jury returned verdicts finding the defendant guilty of burglary in the first degree and murder in the first degree as charged in the indictments. The jury, however, having failed to make any recommendation with respect to punishment, the court imposed the death sentence in each case. The defendant appealed. After the judgments were entered the defendant petitioned that his trial counsel be relieved and that the present attorneys of record be appointed to prosecute his appeal. The court made the requested orders.

*Robert Morgan, Attorney General, by Burley B. Mitchell, Jr., Assistant Attorney General for the State.*

*Chambers, Stein, Ferguson & Lanning by Adam Stein, Kenneth S. Broun for defendant appellant.*

HIGGINS, Justice.

By Exceptions Nos. 28 through 68, the defendant challenged the court's findings and order culminating in the admission of his confession in evidence before the jury. The evidence before the court with reference to the circumstances under which the confession was obtained was free from conflict. Its interpretation, therefore, became a question of law.

Here is a summary of the essential facts as disclosed by the testimony of the officers: Eighteen days after the dead body of Mrs. Lloyd was discovered, the officers questioned the defendant, an 18-year-old retarded colored male with 60 IQ. Officer Horton, describing the defendant, testified: "Both his parents are deceasesd. And he more or less grew up like . . . a weed on the street fighting for his survival."

At first he denied any knowledge of Mrs. Lloyd's death and he stated that he was out the night of September 4-5 with named friends. When questioned, they failed to corroborate his story. Thereafter, on September 23-24, the officers conducted a further interrogation, pointing out the contradictions in his stories.

While that interrogation was underway, a bondsman for the defendant in another criminal case "turned him in." Thereafter, he was in custody. The interrogation continued in the Chapel Hill solicitor's office until 1:30 a.m. At that time he began to cry and admitted to the officers he had broken into Mrs. Lloyd's house for the purpose of stealing. She awakened, began screaming, and he choked her. He then disconnected the telephone and left. The officers reduced the confession to writing, using as much of defendant's words as fitted the story. They obtained a promise from him that he would repeat the confession and sign it in the presence of an attorney when the court appointed one to represent him.

Although it was after midnight and the interrogation had been underway for several hours, the investigating officers left Chapel Hill with the defendant in custody, having called the district judge who appointed Mr. Noell attorney for the prisoner. Mr. Noell reported at once to the Hillsborough jail and conferred briefly with the defendant. The officers then, in the presence of Mr. Noell, presented the confession written in Chapel Hill and requested the defendant to sign it as he had promised to do before he saw Mr. Noell. Notwithstanding the advice of his attorney not to sign the confession or make any admissions, one of the officers reminded the defendant of his promise and admitted he said to John: " . . . (I)f this is the statement you gave me, I would like your signature here. And this is the time that John signed it." The confession was offered and admitted in evidence over the defendant's objection.

The record discloses the Miranda warnings were given before any of the interrogations, but the defendant was without the presence or the advice of counsel until just before placing his signature on the writing prepared by the officers. The incidents here involved occurred prior to October 30, 1971, when G.S. 7A-457 was amended. *State v. Wright,* 281 N.C. 38, 187 S.E. 2d 761; *State v. Blackmon,* 280 N.C. 42, 185 S.E. 2d 123; *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561.

It is obvious that the defendant's promise that he would repeat the confession in the presence of his attorney in Hillsborough outweighed the advice of the attorney. The confession obtained after a long questioning in the absence of counsel was inadmissible. When it was repeated pursuant to the promise, the taint was not removed. The prisoner was required to make a

decision between the advice of his attorney not to sign and the promise he had made to the officers when he was not represented by counsel that he would sign in the presence of the attorney. He chose to disregard the advice of counsel and to keep his promise to the officers. Such was the uncontradicted evidence of the State's witnesses.

There was actually no break in the interrogation procedure beginning early in the evening at Chapel Hill and culminating in the signing of the confession at 3 o'clock in the morning in Hillsborough. At the end of a long interrogation without counsel, the defendant, in tears, had made the confession. The inference is inescapable that the officers, thereafter, were in a hurry to have the defendant repeat the confession in the presence of a lawyer. As soon as the confession was obtained, although after midnight, the officers called the district judge who appointed Attorney Noell. Mr. Noell appeared promptly at the jail in Hillsborough where he advised the defendant not to make any admissions and not to sign any papers. The defendant signed after the officers told him that he need not follow the advice of his counsel. He signed on the line as requested by the officers.

The confession in Chapel Hill was inadmissible as having been induced at a time when the defendant was without counsel. The promise to repeat it was also made without counsel. It is not altogether surprising that this retarded boy paid more attention to his recent promise to the officers than he did to the advice of an attorney whom he did not know. The officers were his custodians. The attorney was a stranger. In this setting, the confession cannot qualify as voluntary.

The test by which admissibility is measured, was stated by Chief Justice Stacy in *State v. Moore,* 210 N.C. 686, 188 S.E. 421:

"Voluntary confessions are admissible in evidence against the party making them; involuntary confessions are not. A confession is voluntary in law when—and only when—it was in fact voluntarily made . . . .

\* \* \* \* \* \* \* \*

"It is true that where a confession has been obtained under circumstances rendering it involuntary, a presumption arises which imputes the same prior influence to any

subsequent confession, and this presumption must be overcome before the subsequent confession can be received in evidence." (Citing authorities.)

The Supreme Court of the United States in *Clewis v. Texas*, 386 U.S. 707, 710, stated the rule:

"On this record, we cannot hold that petitioner's third statement was voluntary. It plainly cannot, on these facts, be separated from the circumstances surrounding the two earlier 'confessions.' There is here no break in the stream of events from the time Sunday morning when petitioner was taken to the police station to the time Tuesday morning some nine days later that he signed the statement in issue, sufficient to insulate the statement from the effect of all that went before. Compare *United States v. Bayer*, 331 U.S. 532, 540 (1947) with *Reck v. Pate*, 367 U.S. 433, 444 (1961)."

In *State v. Gray*, 268 N.C. 69, 150 S.E. 2d 1, this Court stated the rule:

" . . . 'Any circumstance indicating coercion or lack of voluntariness renders the admission incompetent.' *State v. Guffey, supra.* The fact that the defendant was in custody when he made the statement is a circumstance to be considered. *State v. Guffey, supra.* The mental capacity of the defendant is also a circumstance to be considered. *State v. Whittemore*, 255 N.C. 583, 122 S.E. 2d 396. There may, of course, be coercion of the mind without physical torture or threat thereof. *State v. Chamberlain*, 263 N.C. 406, 139 S.E. 2d 620."

On the record before us we are forced to conclude the evidence before the able trial judge was insufficient to support his finding the defendant's written confession was voluntary. The court committed prejudicial error in permitting the State to offer it in evidence.

Other Assignments of Error do not require discussion.

For the court's error in admitting the defendant's confession, the verdicts are set aside, the judgments are vacated, and it is ordered that on each charge there be a

New trial.