STATE OF NORTH CAROLINA v. CHARLES D. THOMPSON

No. 41

(Filed 6 June 1975)

1. Criminal Law § 15; Jury § 2— change of venue — jurors from another county — prominence of victim — newspaper publicity

In this kidnapping and murder prosecution, the trial court did not abuse its discretion in the denial of defendant's motion. for a change of venue or for a jury to be summoned from another county on grounds that the prominence of the victim and inflammatory publicity contained in the local newspapers would prevent a fair trial in the county or by jurors drawn from the county.

2. Criminal Law § 76— admissibility of confession — findings and conclusions — appellate review

Findings of fact made by the trial judge after conducting a *voir dire* hearing on the admissibility of a confession are conclusive and binding on the appellate courts if supported by competent evidence, but the conclusions of law drawn from the facts found are reviewable by the appellate courts.

3. Criminal Law § 75— confession — Miranda warnings — necessity · for determination of voluntariness

Even though there was ample evidence that the procedural requirements of *Miranda* were employed by officers upon the taking of in-custody statements from defendant, it must still be determined whether, under all of the surrounding circumstances, defendant made the statements voluntarily and understandingly.

4. Criminal Law § 75— confession — youthfulness — low mentality

Defendant's youth and low mentality, standing alone, were not sufficient to render his confession involuntary; nor does the fact that the confession occurred after prolonged interrogation necessarily render it involuntary.

5. Criminal Law § 75— confession — father's advice to waive rights — prolonged interrogation

Defendant's confession was not rendered involuntary because his father, a policeman, told him to sign waivers of his rights or because the record discloses prolonged interrogation of a highly impressionable young man where defendant had ready access to his family and friends, before each interrogation defendant was warned of his constitutional rights, including his right to counsel, and the record discloses an absence of promises, threats or other coercive actions.

6. Criminal Law § 106— necessity for evidence in addition to confession

While a conviction cannot be sustained upon a naked extrajudicial confession, the case should be submitted to the jury if the State offers into evidence sufficient extrinsic corroborative circumstances as will, when taken in connection with the confession, show that the crime was committed and that the accused was the perpetrator.

7. **Homicide § 21; Kidnapping § 2— sufficiency of evidence**

    The State's evidence was sufficient for the jury in a prosecution for kidnapping and murder where, in addition to defendant's confession, there was evidence tending to show that defendant had the opportunity to steal the pistol which was shown to have fired the fatal bullets, and that on the night of the crime defendant had in his possession an automobile similar to the one belonging to deceased, a large sum of cash, a pistol the same color as the one which fired the bullets into deceased's body, and some empty shells.

8. **Constitutional Law § 36; Criminal Law § 135— death penalty for murder**

    Death sentence was constitutionally imposed for first degree murder.

    Chief Justice SHARP and Justices COPELAND and EXUM dissenting as to death sentence.

APPEAL from *Martin (Robert M.), S.J.,* May 1974 Special Term of the RUTHERFORD County Superior Court.

Defendant was tried upon two bills of indictment, proper in form, charging the murder and kidnapping of Van Gudger Watkins. Prior to trial defendant moved (1) for change of venue or special venire on grounds of adverse pretrial publicity and (2) for dismissal because of denial of effective assistance of counsel. Both of these motions were denied.

The State's evidence tended to show the following facts:

Terry Watkins, nephew of the victim, testified that on 18 February 1974 decedent bought a 1972 Chevrolet four-door hardtop from him. On the following Wednesday morning (20 February 1974), he saw the same automobile which he had sold to his uncle. The windows of the car were smoke-stained, and one could not see into the car.

Clarence Simmons, of the Rutherford County Sheriff's Department, testified that he had known decedent and that he observed his body at a rural cemetery at Doggett's Grove in Rutherford County about 7:45 p.m. on 20 February. The body was lying face down on the ground and was clothed in trousers, cowboy boots, a hat, a yellow shirt, and a blue denim jacket. There was blood on the face. The body was taken to the hospital morgue, where an autopsy was conducted by Dr. Paul Hurt in the presence of the witness and three other law enforcement officers.

Dr. J. Paul Hurt, stipulated to be an expert in the field of pathology, testified that he conducted an autopsy on the body of Van Watkins on 21 February 1974 in the presence of law enforcement officers. His examination revealed that decedent had been shot at least four times; two wounds appeared in the left upper chest, two wounds in the right back. One of the bullets in the left upper chest had traveled through the right ventricle of the heart and entered the abdominal cavity. This wound caused perforation of the heart and resulted in death. Decedent also received a blow on his head which caused compound skull fractures, but this blow was inflicted after death. The doctor removed from the body four bullets which he gave to one of the law enforcement officers.

Sheriff Blaine Yelton testified that he had a conversation with defendant about 9:02 p.m. on 2 March 1974, in the presence of defendant's parents, Earl Hatcher, and Hollis Pressley. Upon defendant's objection to the admission of statements made during this conversation, the trial judge excused the jury and conducted a *voir dire* hearing. Detailed facts relating to the evidence on *voir dire* appear in the opinion. After conducting the *voir dire*, the trial judge made findings of fact and concluded that the statement made on this occasion was freely, understandingly, voluntarily, and intelligently made after a voluntary and intelligent waiver of right to counsel.

The jury returned, and the witness testified before the jury that defendant told him that he had killed Van Watkins. On 19 February 1974, between 7:00 and 7:30 defendant was walking up a street in Forest City when he saw decedent drive up, get out of his car, and reach into his pocket to pull out his keys. As decedent reached into his pocket, a roll of money fell out. Defendant then decided to rob decedent. After Watkins entered his establishment, defendant followed him inside, and by use of a .22 revolver forced him to re-enter his car. They then drove to the cemetery at Doggett's Grove, where Watkins gave him the money and told him that he would never get away with the crime. He then shot Watkins five times because he knew that decedent could identify him. In order to be sure that decedent was dead, defendant hit him on the back of the head with a large piece of concrete. Defendant proceeded to Shelby in Mr. Watkins' automobile and rented a room at the Governor's Inn Motel, where he later brought his girl friend, Vanessa Whitworth. They watched television and then went to bed. During

their stay at the motel, he showed her the gun and the money and told her he got the money from a credit union. Thereafter he drove the automobile to an area behind Dunbar School and set it afire. On 25 February he hid the pistol in a tree. A few minutes after completing this statement, defendant took the Sheriff and other officers to the tree, where they retrieved the pistol. He admitted that he took the gun from P. G. Woods's automobile on 19 February.

On cross-examination the Sheriff testified as to two previous, exculpatory statements which defendant had made, including one which inculpated two other persons who were subsequently exonerated. He denied that he told defendant that, unless he confessed to the crime, he would have to recommend the death penalty. This answer brought an angry and disruptive response from defendant, who threw law books at the Sheriff and shouted at him to "quit lying." The trial judge excused the jury during defendant's outburst, admonished defendant to keep quiet on pain of contempt or other measures to control his disruptive conduct, and declared a recess. At the end of the recess, the Court denied defendant's motion for mistrial based upon defendant's own outburst.

Vanessa Whitworth testified that she was with defendant on the night of 19 February 1974 in his room at the Governor's Inn Motel in Shelby. She did not remember what kind of car defendant was driving on that night but stated that she remembered the word "Impala" on the dashboard. During her stay at the motel, she saw a gun in a drawer, and she saw defendant put three empty shells in an ashtray in the room.

On cross-examination, she stated that the officers who came to question her told her that, if she did not tell the truth, she could be charged with murder and get the death penalty. She did not recall anyone's telling her that defendant was going to get the death penalty.

The State offered evidence through S.B.I. agents which tended to show that the pistol which defendant pointed out to the officers (State's Exhibit 4) was the weapon which fired the bullets taken from the body of deceased.

P. G. Woods testified that on 17 February 1974 defendant rode with him to their place of employment, Fieldcrest Mills. Before getting out of the car at the plant, the witness opened the glove compartment to get some matches. In the glove com-

partment at that time was a .22 caliber pistol. The witness locked his car upon leaving it. They arrived at work about 11:00 p.m. About 5:00 a.m. the following morning, defendant told the witness that he had caught up with his work and that he wanted the keys to the car so that he could lie down in the car until witness got off at 7:00 a.m. He gave the keys to the car to defendant but did not authorize him to take it anywhere. When his shift was over, he saw that his car had been moved in the parking lot. He found defendant in the car, and they went home. When the witness arrived at home, he did not lock his car. That afternoon about 3:00 p.m., he went to the glove compartment for some matches, discovered that the revolver was missing, and reported the theft to the Forest City Police Department. The witness identified State's Exhibit 4 as being the pistol which was in his glove compartment. He testified that the pistol was loaded with six rounds of ammunition at the time it was taken.

The State rested, and defendant unsuccessfully moved for judgment as of nonsuit.

Both of defendant's parents testified in his behalf as to his prior emotional problems and to circumstances surrounding his confession.

At the close of all the evidence, defendant renewed his motion for judgment as of nonsuit, which motion was again denied.

The jury returned a verdict of guilty as charged in both bills of indictment, and the Court imposed the mandatory sentence of death on the murder charge and life imprisonment on the kidnapping charge. Defendant appealed.

*Attorney General James H. Carson, Jr., by Assistant Attorney General Charles M. Hensey, for the State.*

*Robert W. Wolf and Charles V. Bell for defendant.*

BRANCH, Justice.

[1] Defendant assigns as error the trial judge's denial of his motion for change of venue or for a jury to be summoned from a county other than Rutherford. Defendant based his motion on the grounds that the prominence of the victim and the inflammatory publicity contained in the local newspapers would pre-

vent a fair trial in Rutherford County or by jurors drawn from that county. After considering defendant's affidavit, the record, and oral arguments of counsel, Judge Martin denied defendant's motion.

The newspaper accounts upon which defendant depends do not appear to be beyond the bounds of propriety or to be inflammatory. Neither does defendant show that the prominence of the victim has unfairly affected his trial. This record does not disclose that defendant exhausted his peremptory challenges or that defendant had to accept any juror objectionable to him.

Defendant's motion was addressed to the sound discretion of the trial judge. *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721; *State v. Blackmon,* 280 N.C. 42, 185 S.E. 2d 123; *State v. Ray,* 274 N.C. 556, 164 S.E. 2d 457. No abuse of discretion on the part of the trial judge is shown.

This assignment of error is overruled.

The principal question presented by this appeal is whether the trial judge erred in denying defendant's motion to suppress evidence of in-custody statements made by defendant to police officers.

During the direct examination of Blaine Yelton, Sheriff of Rutherford County, the solicitor inquired about statements made by the defendant to the Sheriff. Upon defense counsel's objection, the jury was excused and a *voir dire* hearing conducted.

On *voir dire* Sheriff Yelton testified that about 5:20 p.m. on 27 February 1974, pursuant to his request, defendant's father, a sergeant on the police force in Spindale, North Carolina, brought defendant to the jail for the purpose of interrogation concerning a gun which had been taken from P. G. Woods. Defendant signed a waiver of his constitutional rights, including waiver of counsel, on this occasion, but the Sheriff stated "it is possible that he did not at first want to sign the waiver of rights and that his father told him to sign it . . . . " The Sheriff could not recall whether the murder of Watkins was mentioned at this first encounter. This interrogation lasted for over an hour, and upon its completion defendant was taken into custody upon authority of a telegram from the North Carolina Parole Board indicating a revocation of defendant's parole. Defendant was questioned several times during the night or early morning hours of 28 February. According to the Sheriff's notes, the second

interrogation occurred at 1:35 a.m. on 28 February, and the last questioning during this interval took place about 5:00 a.m. on 28 February. He could not say whether defendant had any sleep or food during the night of 27 February. The Sheriff next questioned defendant at 1:55 p.m. on 28 February. At this time defendant's father was present, and defendant signed a waiver of his constitutional rights at the suggestion of his father. Prior to signing the waiver, defendant asked his father if he should answer questions, and the father on two occasions said that it was up to him and another time or two told his son that he had nothing to hide and should therefore talk to the Sheriff. After signing the waiver, defendant made statements implicating Alexander Hamilton and Randy Wesley and also to some degree incriminating himself in the murder of Watkins. Another interrogation took place at 7:50 p.m. on 28 February in the presence of Alexander Hamilton, Randy Wesley, Officers Hatcher, Simmons, Chambers, and the Sheriff. Following this interrogation defendant was charged with murder, and Hamilton and Wesley were released without being charged. On 1 March the Sheriff, together with Officers Hatcher and Pressley, questioned defendant for about an hour and a half concerning inconsistencies in his previous statements.

On 2 March defendant was again questioned and at that time told the Sheriff where he could find the murder weapon. Search for the weapon was made to no avail.

On the night of 2 March about 7:00 p.m. defendant's mother and father were allowed to talk to him, and after they had talked with him for about thirty minutes, defendant's mother told the Sheriff that defendant wanted to make a statement. On this occasion, in addition to the Sheriff, Officers Pressley, Hatcher, and defendant's mother and father were present. The Sheriff again advised defendant that he had a right to remain silent, that anything that he said could be used against him in a court of law, that he had a right to have an attorney present during any questioning, and that he did not have to answer any question until he talked to this attorney. In addition, the Sheriff stated that he read defendant's rights to him and that defendant signed a waiver of his constitutional rights, including waiver of counsel, before making any statement. The Sheriff denied that he ever told defendant that it might be easier on him if he confessed or that he would recommend the death penalty if defendant did not tell the truth. He said that at this time defendant seemed remorseful and was crying part of the time.

Dorothy Thompson, defendant's mother, testified that when she talked to her son on 2 March, he told her that the Sheriff had told him that if defendant didn't tell the truth, the Sheriff would recommend the death penalty. At that time her son was very upset and was crying and trembling. Upon her inquiry the Sheriff told her that he told the defendant about the death penalty "to get him to tell the truth because he [the Sheriff] had been on so many wild goose chases." She gave testimony which indicated that defendant was mentally and emotionally unstable. She was present when defendant made his statements on 2 March, and, according to her testimony, the Sheriff on several occasions suggested details to which defendant consented. She admitted that defendant told her that he killed Watkins, but only after the Sheriff had mentioned the death penalty to him.

Forrest Thompson, defendant's father, testified that, prior to arriving at the Sheriff's Department on 27 February, he asked defendant whether he had killed Watkins, and defendant had replied in the negative. At the initial questioning, defendant at first refused to sign a waiver of rights, but he, the father, told him to go ahead and sign it. The witness stated that he so advised his son because "I felt like if he didn't kill the man, he could go ahead and talk to them freely." It was his opinion that had he not told his son to sign the waiver, the boy would not have signed it. The father was in the police station at that time as an officer of a municipality in Rutherford County, and if he had not been a policeman, he would have told his son not to say a word. With regard to the length of interrogation, the witness testified:

I brought him to the jail somewhere around 3:15 to 3:30 and I left the jail at approximately 5:00 a.m. the next morning on the 28th. I stayed at the jail because Charles was in the Sheriff's office being interrogated continuously from 3:30 p.m. until 5:00 a.m. the next morning. He never told the Sheriff that he had killed the deceased but he remained in the Sheriff's office all this time. He was placed in a cell at approximately 4:30 or a quarter to five, in fact the Sheriff never put him under arrest until about 2:00 a.m., no warrant was issued for him but the Sheriff kept telling him I've got papers to put you in the jailhouse right now but he never produced those papers until about 2:00 a.m. The papers were for violation of probation and it was

a telegram that he had received that gave him the authority to pick Charles up.

\*     \*     \*

During the time I was at the jail he did not have anything to eat and I left about five a.m., none of us had anything to eat. There were quite a few men interrogating him, Sheriff Yelton, Earl Hatcher, Charles Chambers and Johnny Wilkins all interrogated him. I was not present during all of the interrogation. The room where the interrogation took place was an eight by ten room, everyone was sitting down at a table, there were no windows in the room.

During the interrogation he didn't appear nervous until over in the morning, then he got real nervous. After I left at 5:00 a.m. the next time I returned to the jail was about noon on the 28th and when I got to the jail he was in the Sheriff's office, but I don't recall who was in there with him. When I went in he appeared nervous and he was sleepy then because he said he didn't go to bed until after he eat [*sic*] breakfast that morning and this was a little after noon then.

The witness further testified that he himself, at the direction of the Sheriff, arrested Alexander Hamilton, whom defendant first implicated in the criminal act. This individual was later released when it appeared that he had nothing to do with the crime. The father also stated that his son made five confessions in reference to this case, all of which statements were reduced to writing by the Sheriff. He said that two of the confessions were taped and that during these taped sessions, "the Sheriff would ask Charles about it and go over it and if Charles wouldn't say anything about it the Sheriff would go back until he got it down to just where he wanted it. He would get it down to where he wanted it and then say let's tape it. On one occasion Charles refused to tape it, but I myself asked him to go ahead and tape it. . . ."

I did not tell him to sign all of the waivers. I told him to sign the first one, and I directed him to sign the last one. Charles refused to sign the last one until I directed him to so do, he was crying very heavily and trembling and lying on my wife's lap. That's when I kept telling him that the Sheriff and what he had said about

the death penalty didn't mean anything. I am definitely convinced that the Sheriff told my son about the death penalty.

On cross-examination the witness said that the law enforcement officers advised defendant of his rights every time that he, the father, was present at the questioning but that he was not there all the time when the Sheriff was asking questions. He conceded that the Sheriff had no control over him, could not fire him, and could not order him to do anything. The services he performed in the investigation of the case and in the taking into custody of the others implicated by his son were services done at the request of the Sheriff. The father explicitly stated that the services he rendered were done as "a private citizen."

Sheriff Yelton, recalled on *voir dire*, testified that he could not recall confronting defendant with his prior criminal record, "but it is possible that I did." The Sheriff further denied making suggestions to defendant as to what he should say in his confession and stated that counsel was not appointed for defendant immediately after he was charged because defendant's father told him that they were going to employ private counsel. He stated that the father's involvement in the case was more a matter of courtesy than of law enforcement activity.

Dr. Robert Rollins, a licensed physician and specialist in psychiatry, Director of Forensic Services for the Division of Mental Health Services of the North Carolina Department of Human Resources and Director of the Forensic Unit at the Dorothea Dix Hospital in Raleigh, testified that, as a result of the psychiatric evaluation of defendant at Dorothea Dix Hospital in April, 1974, he had formed certain conclusions with regard to defendant's mental condition. He indicated that defendant had an I.Q. of 55, which indicated that he was mildly mentally retarded, "a person whose intellectual functioning is below the average, particularly in the areas of judgment." He further stated that in the three areas tested, defendant functioned at fifth-grade level in reading ability, third-grade level in spelling, and fourth-grade level in arithmetic. He stated that defendant was easily influenced by other people, "more easily intimidated than the average person," although, of course, most average people can be intimidated. He stated that as a result of hearing the tape played in open court prior to his testimony, he felt that "Mr. Thompson was obviously upset and under stress at the time he gave an opening account of the events that he was

asked about and that he responded to various questions that were put to him." He further stated that defendant was, in his opinion, "a person who had some diminished responsibility although I do consider him to be responsible under the usual rules and circumstances that you describe, but it is my opinion that he is influenced by other people to waive his rights." In short, it was the witness's opinion that, with regard to the waiver of rights, defendant "was not acting of his own free will." In summary, the doctor's opinion was as follows:

> It is my honest feeling that that statement reflected not so much a willing and voluntary accounting of the events recalled by the defendant as it did agreeing that the facts put to him by other persons were correct. I, of course, have only heard that one time.

On cross-examination by the solicitor, the witness stated that his assessment of the situation was that defendant "found himself in trouble and first tried to get out of it as people often do, but characteristically mentally retarded people do so by saying they had nothing to do with it. He was through circumstances urged by his father to participate in the process and his next story was that it wasn't him but some other people then if I understand it correctly the next story was that it was just him." The witness further testified that a person with defendant's I.Q. could satisfactorily perform in a textile plant, "and I think with some effort he could pass the North Carolina driver's license exam."

The State presented other evidence with regard to the taking and the transcribing of defendant's statement, all of which evidence tended to show that defendant voluntarily waived his rights and made a statement in accordance with the requirements of *Miranda* and that his utterances were freely and voluntarily made.

After hearing the evidence, the Court made the following findings of fact:

> The Court finds as a fact from the testimony that Charles Thompson was interrogated by the Sheriff of Rutherford County several times commencing in the afternoon of February 27th and concluding on March 2, 1974, in connection with the investigation of the death of Van Watkins; that on February 27, 1974, the Defendant was

brought to the Sheriff's office by the Defendant's father and thereafter legally held in jail by reason of a parole violation; that before any questioning by the Sheriff he was warned of his Constitutional rights and signed a waiver of his rights which appear of record.

The Court further finds that after interrogation on several occasions the law enforcement officers would check out the matters brought out on interrogation and upon discovering inconsistencies and confronting the Defendant, other statements were made by the Defendant, later implicating other persons who were formerly charged along with the Defendant with the murder of Van Watkins; that upon each interrogation the Defendant was warned of his Constitutional rights and each time signed a waiver of those rights; that subject to the implication of other persons by the Defendant and on the evening of March 2, 1974, the Defendant's mother and father visited him in the jail and were allowed to confer with their son in private and thereafter informed the Sheriff that their son wished to talk with him and that a statement was made by the Defendant on the evening of March 2, 1974, which appears of record.

The Court finds as a fact that before making any statement and before he was interrogated, the Defendant was warned by the Sheriff of his Constitutional rights; that he was advised before any questions were asked him that he must understand his rights; that he had the right to remain silent and not make any statement; that anything he said could and would be used against him in a Court; that he had the right to talk to a lawyer for advice before he was asked any questions; that he had the right to have anyone else with him that he requested that he was advised that if he could not afford a lawyer, one would be appointed by the Court before any questioning; that if he desired to answer questions without a lawyer present, he had the right to stop answering questions at any time; that he had the right to stop answering questions until he had the opportunity to talk to a lawyer.

The Court further finds that the Defendant signed a waiver of his rights on each occasion before he was interrogated to the effect that he had read a statement of his rights and understood what his rights were; that he

was willing to make a statement and answer questions; that he did not want a lawyer at that time; that he understood what he was doing and that no pressure or threat had been made to him and no threat or coercion had been used against him by anyone; that each of these warnings and waiver of rights had been offered by the State and has been received in evidence for the purpose of the Voir Dire.

The Court further finds as a fact that the defendant's father has engaged in law enforcement for the past ten years; that for the past four years he has been a police officer for the Town of Spindale; that prior to that time he was a deputy sheriff for Rutherford County; that he accompanied his son to the Sheriff's office on February 27th and remained with him throughout the night and was present during the questioning by the Sheriff's Department; that thereafter he visited his son in the jail and in the Sheriff's office from time to time for the next several days; that the Defendant's mother visited her son at the jail and at the Sheriff's Department several times during the period from February 27th until March 2nd; that the parents of the Defendant were never refused the right to see and talk with their son both in the company of the Sheriff and privately; that the Defendant had the opportunity of rest in the jail facilities and the opportunity to have regular meals in the jail; that the Rutherford County jail was a practically new building, being less than a year old, and was equipped with proper and adequate facilities for caring for persons incarcerated therein.

The Court further finds that the Defendant is 19 years of age and is mildly retarded, went through the 9th grade, holds a valid North Carolina driver's license since he was 16 years of age and for some time prior to February 27, 1974, was regularly employed in the textile industry and that he knows the difference between right and wrong.

The Court further finds as a fact that subsequent to the implication of other persons by the Defendant in connection with the death of Mr. Van Watkins the Defendant's father and mother voluntarily went to the jail. of Rutherford County and was there allowed to talk privately with their son; that after talking with their son for some period of time the Defendant's mother went to the Sheriff· and

informed him that their son had a statement to make to the Sheriff; that thereupon the Sheriff in the presence of the Defendant's mother and father and in the presence of Mr. Hatcher of the State Bureau of Investigation and in the Sheriff's private office again warned the Defendant of his Constitutional rights; that he was advised that before any questions were asked he must understand his rights; that he had the right to remain silent and not make any statement; that anything he said could and would be used against him in a Court;

That he had the right to talk to a lawyer for advice before any questions were asked him or have with him anyone else during questioning; that if he could not afford a lawyer, one would be appointed for him by the Court before any questioning, but if he desired to answer questions without a lawyer present that he had the right to stop answering questions at any time; he also had the right to stop answering questions at any time until he talked to a lawyer; that the Defendant signed a waiver of rights which appears as State's Exhibit No. 3 for the Voir Dire to the effect that he had read the statement of his rights and understood what they were; that he was willing to make a statement and answer questions; that he did not want a lawyer at that time; that he understood and knew what he was doing; that no promises or threats had been made to him and no pressure of coercion of any kind had been used against him by anyone; that the rights and waiver of rights included on one sheet of paper and entitled State's Exhibit No. 3 was signed by Charles Thompson and witnessed by Sheriff Yelton and Earl Hatcher at 9:02 P.M. on March 2, 1974.

The Court finds as a fact that opportunity to exercise the constitutional rights of the Defendant were accorded to the Defendant throughout the interrogation; that he thoroughly and fully understood his rights;

That the defendant requested no attorney and did not refuse to make a statement to Sheriff Yelton; and by doing so, knowingly, intelligently and understandingly waived any constitutional rights accorded to the Defendant and intelligently, knowingly and affirmatively waived the right to have counsel present with him at the time of making a statement to Sheriff Yelton.

The Court finds that the Defendant freely, understandingly, voluntarily and intelligently made a statement to Sheriff Yelton at approximately 9:05 P.M. on March 2, 1974, without undue influence, coercion or duress and without any promise, threat, reward or hope of reward; that he had been fully advised of his constitutional rights and understood his rights; that after being advised of his rights he knowingly and intelligently waived his right to counsel at the time of interrogation and making of statement to Sheriff Yelton.

It is therefore adjudged that the Defendant's answers and statement to Sheriff Yelton are competent and can be admitted into evidence before any jury.

[2]  Upon the motion to suppress, the trial judge properly excused the jury and conducted a *voir dire* hearing to determine the admissibility of the challenged in-custody statements. *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1, *cert. denied,* 386 U.S. 911, 87 S.Ct. 860, 17 L.Ed. 2d 784. It is now well settled in this jurisdiction that after conducting a *voir dire* hearing, the trial judge's findings of fact, if supported by competent evidence, are conclusive and binding on the appellate courts. Nevertheless, the conclusions of law drawn from the facts found are reviewable by the appellate division. *State v. Pruitt,* 286 N.C. 442, 212 S.E. 2d 92; *State v. Hines,* 266 N.C. 1, 145 S.E. 2d 363. In *State v. Pruitt, supra,* we said:

In instant case there was plenary evidence that the procedural safeguards required by the *Miranda* decision were recited by the officers and that defendant signed a waiver stating that he understood his constitutional rights, including his right to counsel. Even so, the ultimate test of the admissibility of a confession still remains whether the statement made by the accused was in fact voluntarily and understandingly made. *State v. Bishop, supra; State v. Gray, supra; State v. Conyers,* 267 N.C. 618, 148 S.E. 2d 569; *State v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572. The fact that the technical procedural requirements of *Miranda* are demonstrated by the prosecution does not, however, standing alone, control the question of whether a confession was voluntarily and understandingly made. The answer to this question must be found from a consideration of the entire record. *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed. 2d 895; *Blackburn v. Alabama,* 361 U.S. 199,

80 S.Ct. 274, 4 L.Ed. 2d 242; *State v. McCloud,* 276 N.C. 518, 173 S.E. 2d 753.

[3]   Here, as in *Pruitt,* there was ample evidence that the procedural safeguards required by *Miranda* were employed by the officers upon the taking of the statements from defendant. Nevertheless, we must still determine whether, under all of the surrounding circumstances, defendant voluntarily and understandingly made the inculpatory statements.

Some of the factors to be considered in deciding whether a statement is voluntarily and understandingly made are set forth in the case of *State v. Wright,* 274 N.C. 84, 161 S.E. 2d 581. There Justice Huskins, speaking for the Court, said:

> "The test of admissibility is whether the statement by the defendant was in fact made voluntarily." *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1. See also *State v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572; *State v. Gosnell,* 208 N.C. 401, 181 S.E. 323; *State v. Livingston,* 202 N.C. 809, 164 S.E. 337. The admission is rendered incompetent by circumstances indicating *coercion* or *involuntary* action. *State v. Guffey,* 261 N.C. 322, 134 S.E. 2d 619. The "totality of circumstances" under which the statement is made should be considered. *State v. Chamberlain,* 263 N.C. 406, 139 S.E. 2d 620. Mental capacity of the defendant, *State v. Whittemore,* 255 N.C. 583, 122 S.E. 2d 396, whether he is in custody, *State v. Guffey, supra,* the presence or absence of mental coercion without physical torture or threats, *State v. Chamberlain, supra,* are all circumstances to be considered in passing upon the admissibility of a pretrial confession and in passing upon the voluntariness of a waiver of constitutional rights. [Emphasis supplied.]

The fact that the defendant was youthful and that he made the challenged statements in the presence of police officers does not render the statements inadmissible, absent mistreatment or coercion by the officers. *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561; *State v. Murry,* 277 N.C. 197, 176 S.E. 2d 738. Neither does a subnormal mentality, standing alone, render a confession incompetent if it is in all other respects voluntarily and understandingly made. If a person has the mental capacity to testify and to understand the meaning and effect of statements made by him, he possesses sufficient mentality to make a confession. Nevertheless, his mental capacity, or his lack of it,

is an important factor to be considered in determining the voluntariness of a confession. *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed. 2d 242; *State v. Thorpe*, 274 N.C. 457, 164 S.E. 2d 171; *State v. Whittemore*, 255 N.C. 583, 122 S.E. 2d 396.

[4] In this case defendant is a nineteen-year-old mildly retarded person who, according to an expert witness, was more easily intimidated than the average person. He was described by Dr. Rollins as "a person who has some diminished responsibility although I do consider him to be responsible under the usual rules and circumstances." It would seem to follow that a person who is responsible under usual circumstancese possesses sufficient intelligence to testify and to know the meaning and effect of a confession. We, therefore, are of the opinion that defendant's youth and his lack of high mentality, standing alone, were not sufficient to render his confession involuntary. Nor does the fact that the confession occurred after prolonged interrogation necessarily render the statement involuntary. 29 Am. Jur. 2d *Evidence* § 550 at 605. There remains, however, the decisive question of whether coercion rendered defendant's in-custody statements involuntary and therefore inadmissible into evidence.

*State v. Edwards*, 282 N.C. 201, 192 S.E. 2d 304, is in many respects factually similar to instant case. There the defendant, a retarded eighteen-year-old boy, was questioned concerning a murder on the night of 23-24 September 1971. He was advised of his constitutional rights and at that time denied any knowledge of the crime. On the night of 24 September defendant was again questioned, and while the interrogation was under way, a bondsman for defendant in another case "turned him in." He was then in custody, and the questioning continued until about 1:30 a.m., at which time he began to cry and made inculpatory statements. The *Miranda* warnings were given, but defendant was without counsel and was without the advice of friends or family at that time. This Court held that a confession so elicited was not voluntarily made.

In the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 602, 16 L.Ed. 2d 694, defendant, a seriously disturbed, uneducated boy who was plagued with sexual fantasies, confessed after being interrogated for two hours by police officers. He was not advised of his right to counsel, and at trial the confession was offered into evidence. The Supreme Court found error in the admission of the confession and used the case as

the vehicle for the now familiar procedural safeguards required in all cases involving inculpatory statements.

In *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed. 2d 977, the defendant, a twenty-two-year-old Mexican boy, was in police custody and made incriminating statements after having been denied the right to consultation with his employed counsel, who was on the premises seeking to see his client. In that case the police urged the defendant to make a statement without advising him of his right to remain silent. The Supreme Court held that under these circumstances it was error to admit the confession into evidence.

In *State v. Thorpe, supra,* our Court rejected a confession made by a retarded twenty-year-old accused who was not advised of his right to counsel at the time of his interrogation.

In *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed. 2d 895, a confession was obtained after defendant, an escaped prisoner, was taken into custody and interrogated daily for sixteen days. During that time neither family, friends, nor counsel saw defendant. His arrest sheet contained a memorandum, in part, as follows: "Do not allow anyone to see defendant or allow him to use the telephone." He was fed two sandwiches a day, sometimes supplemented by "peanuts and stuff." Defendant had stated that he had stolen certain goods found in his possession from a place on the railroad between Canton and Asheville. While handcuffed, he was walked along the railroad from Canton to Asheville and was unable to point out the place from which he had stated that he stole the property. He was carried to the scene of the crime in order to observe his reactions. The trial court admitted the confession, but the Supreme Court reversed, stating:

> . . . Davis went through a prolonged period in which substantial coercive influences were brought to bear upon him to extort the confessions that marked the culmination of police efforts. Evidence of extended interrogation in such a coercive atmosphere has often resulted in a finding of involuntariness by this Court. [Citations omitted.] . . .

Instant case differs from the above-discussed cases in which confessions were held to have been erroneously admitted. In none of these cases were there members of the family, friends, or counsel of the accused present during the questioning. We find cases from other jurisdictions which present factual situations

---

State v. Thompson

---

more similar to instant case and provide guidance for our decision.

In *Atwell v. State,* 244 Ark. 739, 427 S.W. 2d 1, the defendant challenged the voluntariness of the confession of guilt. The Court upheld the voluntariness of the confession and specifically pointed to the facts that one of the police officers present during the interrogation was the accused's brother and that that officer did not testify at the trial as constituting "a persuasive indication that the accused's constitutional rights were not infringed." The Court also noted that the defendant admitted on cross-examination that he was informed of his rights and that subsequent to that information he did make an admission of guilt.

In *State v. Alexander,* 252 La. 564, 211 So. 2d 650, the defendant contended that there was error in the introduction into evidence of his written confession on the ground, *inter alia,* that his mother exhorted him to tell the truth. In rejecting his contention, the Court stated: "It is true defendant's mother exhorted him to tell the truth prior to his confession. She was present while the deputy Bonvillain talked to her son. The evidence, however, refuted any suggestion of intimidation or coercion. Under the circumstances, the mother's exhortation does not render the confession involuntary."

Likewise, in *Anglin v. State,* 259 So. 2d 752 (Fla. App.), the defendant, a fifteen-year-old boy, contended that he was coerced into making a confession by remarks of his mother. The testimony of the arresting officer revealed that the mother, who was with the defendant at the time of his arrest, told him to tell the truth, or "she would clobber him." Prior to interrogation, the defendant's rights were explained to him, and he and his mother each signed a card acknowledging that they understood his rights. The mother again told him to tell the truth about what had happened, and that this time he gave a statement implicating himself in the crime. In rejecting the defendant's contention that he was coerced, the Court stated:

> It may well be that an admonition by a parent to her teenage son to tell the truth is held in some psychological circles to constitute a deprivation of the child's constitutional rights. We have not reached such a conclusion in this jurisdiction. The moral upbringing of a child to be a useful citizen necessarily encompasses advice by a parent for the

child to be truthful. The motherly concern of this parent for her offspring and at the same time her concern for the basic precepts of morality are to be commended. We find no element of a threat or coercion on the part of this mother and hold that the controverted confession was freely and voluntarily given by the appellant.

In *Fuller v. United States*, 407 F. 2d 1199 (D.C. Cir.), *cert. denied*, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed. 2d 125, the defendant was being held and asked to speak with her son. The officer who had the defendant in custody replied that he had no objection to the mother's talking to her son but that, because he had the responsibility for defendant, he would have to remain present during their conversation. The defendant had previously been warned of his rights and had thereafter made an inculpatory statement to the police. When the oficer explicitly indicated to the defendant that he would have to remain present during this conversation with his mother, the defendant replied that the officer's presence would "be all right." At no time was the officer's presence during this conversation objected to by either the defendant or his mother. With the officer present, the mother asked the defendant what he had done, and the defendant repeated his prior admission that he had killed a woman. The Court, noting that both the mother and the son were aware of, and acquiesced in, the presence of the officer, and that defendant had been advised of his rights, held that there was no error in admitting into evidence the defendant's admission of guilt made to his mother during this conversation.

Finally, we find particular guidance in *State v. Estrada*, 63 Wis. 2d 476, 217 N.W. 2d 359. In that case, the defendant was arrested, advised of his constitutional rights, and further advised of the particulars of the case. In response to official inquiry, the defendant stated that he understood his rights and questioned the detective as to what evidence led the police to believe that he was involved. He talked freely with the police about his whereabouts during the night of the crime in question, and at no time during this initial interrogation did he exercise his right to silence by requesting that the interrogation cease. After approximately an hour and fifteen minutes of interrogation the defendant was booked and placed in the jail for the night. On the following morning, after a routine lineup, the defendant was taken to the District Attorney's office, where

he was again advised of his rights by the District Attorney and asked whether he would like to make a statement. The defendant replied that he desired to remain silent. At this point, his father, who had been present in the District Attorney's office, asked for permission to talk to his son. This request was granted, and the two of them had a conversation, after which the defendant's father indicated that his son wished to make a statement. The defendant was then asked whether he in fact desired to make a statement, and he replied in the affirmative. Thereupon he made a full confession to the crime for which he was charged. In upholding the lower court finding of voluntariness, the Court emphasized the fact that the defendant was amply advised of his rights and made a statement only after being able to consult with his father.

[5] It is difficult to apply the recognized rules of law to the facts of this case. On the one hand, the record discloses prolonged interrogations of a highly impressionable young man. On the other hand, it is clear that this arrest was not his first encounter with law enforcement officers. He had ready access to family and friends, including a father with many years of police experience. It is not controverted that before each interrogation defendant was fully warned of his constitutional rights, including his right to counsel. In fact, this record discloses a notable absence of promises, threats, or other coercive forces which ordinarily render confessions involuntary.

Defendant's counsel emphasized the fact that the confession was rendered involuntary because defendant's father told him to sign waivers of rights. It must be borne in mind that although the father, Forrest Thompson, was a police officer, he was not in this case a "person in authority" in the sense of having defendant in his control or custody. He was present as defendant's father and by courtesy of the Sheriff. Even in this capacity, the record does not show that he threatened defendant or held out any promise or hope which would overbear defendant's will. We think the fact that defendant had previously been involved with criminal activities indicates that this long-time police officer did not dominate his son. It is reasonably inferable that the father's acts were, in effect, admonitions to his son to tell the truth. Our Courts have consistently held that such admonitions, even by police officers holding an accused in custody, do not render confessions involuntary. *State v. Pruitt, supra; State v. Thomas,* 241 N.C. 337, 85 S.E. 2d 300.

State v. Thompson

There was ample evidence to support the trial judge's findings, and those findings in turn support the trial judge's conclusions that the defendant freely, understandingly, voluntarily, and intelligently made a statement to Sheriff Yelton about 9:05 p.m. on 2 March 1974, without undue influence, coercion, or duress, and without any promise, threat, reward, or hope of reward; that he had been fully advised of his constitutional rights and understood his rights; that after being advised of his rights, he knowingly and intelligently waived his right to counsel at the time of interrogation and making of statement to Sheriff Yelton.

We hold that the trial judge correctly overruled the motion to suppress defendant's confession.

Defendant's contention that he was denied assistance of counsel is without merit. The record reveals that he was told on several occasions that he was entitled to counsel and that counsel would be appointed for him if he so desired. In addition, the Sheriff stated that counsel was not immediately appointed because members of defendant's family indicated that they would employ private counsel. Further, the arguments offered in support of this assignment of error were necessarily considered and decided in the preceding assignment of error.

[6, 7] Defendant assigns as error the denial of his motions for judgment as of nonsuit. Defendant correctly contends that his conviction cannot be sustained upon a naked extrajudicial confession. However, it is equally well settled that if the State offers into evidence sufficient extrinsic corroborative circumstances as will, when taken in connection with an accused's confession, show that the crime was committed and that the accused was the perpetrator, the case should be submitted to the jury. *State v. Jenerett*, 281 N.C. 81, 187 S.E. 2d 735; *State v. Crawford*, 260 N.C. 548, 133 S.E. 2d 232; *State v. Whittemore*, 255 N.C. 583, 122 S.E. 2d 396. Here, in addition to the confession, there was evidence which tended to establish, *inter alia*, that (1) on the night of the crime defendant had in his possession an automobile similar to the one belonging to deceased; (2) defendant had in his possession a large sum of cash on the same night; (3) defendant had opportunity to steal the pistol which was shown to have fired the fatal bullets; (4) on the same night defendant had in his possession a pistol described as being "the same color" as the one which fired the bullets into

deceased's body; and (5) on the night of the crime he was with his girlfriend, who saw him with empty shells in his possession.

We are of the opinion that there was ample extrinsic evidence, when taken with the confession and considered in the light most favorable to the State, to carry the case to the jury. This assignment of error is overruled.

[8] Finally, defendant asserts that the trial judge erred by imposing the death sentence. The questions raised by this assignment of error were considered and found to be without merit in *State v. Jarrette, supra. Accord: State v. Armstrong*, 287 N.C. 60, 212 S.E. 2d 894; *State v. Vick*, 287 N.C. 37, 213 S.E. 2d 335; *State v. Lowery*, 286 N.C. 698, 213 S.E. 2d 255; *State v. Simmons*, 286 N.C. 681, 213 S.E. 2d 280; *State v. Stegmann*, 286 N.C. 638, 213 S.E. 2d 262; *State v. Woods*, 286 N.C. 612, 213 S.E. 2d 214; *State v. McLaughlin*, 286 N.C. 597, 213 S.E. 2d 238; *State v. Lampkins*, 286 N.C. 497, 212 S.E. 2d 106; *State v. Avery*, 286 N.C. 459, 212 S.E. 2d 142; *State v. Williams*, 286 N.C. 422, 212 S.E. 2d 113; *State v. Sparks*, 285 N.C. 631, 207 S.E. 2d 712; *State v. Honeycutt*, 285 N.C. 174, 203 S.E. 2d 844; *State v. Dillard*, 285 N.C. 72, 203 S.E. 2d 6; *State v. Noell*, 284 N.C. 670, 202 S.E. 2d 750.

Because of the imposition of the death sentence, we have carefully reviewed this entire record and find no prejudicial error in the trial of this case.

No error.

Chief Justice SHARP dissents as to the death sentence and votes to remand for the imposition of a sentence of life imprisonment for the reasons stated in her dissenting opinion in *State v. Avery*, 286 N.C. 459, 472, 212 S.E. 2d 142, 149 (1975).

Justice COPELAND dissents as to death sentence and votes to remand for imposition of a sentence of life imprisonment for the reasons stated in his dissenting opinion in *State v. Williams*, 286 N.C. 422, 437, 212 S.E. 2d 113, 122 (1975).

Justice EXUM dissents from that portion of the majority opinion which affirms the death sentence and votes to remand this case in order that a sentence of life imprisonment can be

imposed for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 439, 212 S.E. 2d 113, 121 (1975), other than those relating to the effect of Section 8 of Chapter 1201 of the 1973 Session Laws.